WALTER W. TREICHEL AND ANOTHER v.
NATHAN C. ADAMS AND ANOTHER.
NORBERT J. GOETTL AND ANOTHER, d.b.a.
GOETTL FEED SERVICE, APPELLANTS.

158 N. W. (2d) 263.

April 19, 1968—No. 40,285.

*K. M. Krost,* for appellants.
*Kunz & Mueller,* for respondents.

OTIS, JUSTICE.

This is an action for rent brought by the lessors of a laying house against a lessee egg producer and a feed company with whom plaintiffs allege the producer was engaged in a joint adventure. Judgment by default was entered against the producer, Nathan C. Adams. The matter was tried without a jury as to the partnership Goettl Feed Service. The trial court held that defendants were engaged in a joint adventure and ordered judgment against them in the sum of $1,310. Defendant Goettl appeals from an order denying a motion for amended findings or a new trial.

The facts are not in dispute. On October 14, 1963, Adams purchased 18,000 day-old chicks with the intention of selling them when they were 20 weeks old. They were first placed in a brooder house at Eagle Bend,

Minnesota. Title was taken in the name of Gessell Feed Store, and a chattel mortgage was given to Ralston-Purina Company as security for financing the purchase. While the chickens were at Eagle Bend, feed was provided by Gessell. When the time for selling the pullets arrived there was not an adequate demand for them. Adams decided to transfer them to a laying house and to sell the eggs. To that end he entered a lease with plaintiffs Treichel, dated March 27, 1964, by the terms of which the lessors provided a laying house and equipment at their premises north of New Ulm at an agreed rental of $330 a month for 30 months. Of that amount, only $2,310 has been paid, leaving a balance of $1,320 due at the time the action was commenced.

By the time the flock was moved to the Treichel farm 13,100 pullets remained. In order to continue the financing of feed, title to the chickens was transferred from Gessell to defendant Goettl Feed Service under agreements by which Adams was to assign to Goettl all money received from the sale of eggs until Adams' indebtedness to Goettl was paid, subject to the following conditions:

"It is further agreed that distribution of this money will be made as follows:

"1.    Feed account to be paid first.

"2.    Then $1850.00 to be forwarded each month to Ralston Purina Co., for pullet finance.

"After these costs are met, the balance of the money will be turned over to Nathan C. Adams to cover utilities cost, building rent, labor, and any other costs involved in the operation.

"Goettl Feed Service will provide Nathan C. Adams with a monthly report on the income and outgo of all monies.

"It is further agreed that upon completion of the indebtedness to Ralston Purina Co., ownership of the birds will revert back to Nathan C. Adams, but that the egg assignment will continue to Goettl Feed Service who will continue to keep an accounting of all income and disbursements. Upon completion of the indebtedness to Ralston Purina Co., then Goettl Feed Service would forward to Nathan C. Adams all money over and above feed costs only."

Sometime late in 1964 it became apparent that Adams could not make a profit. Consequently, early in February 1965 the flock was sold pursuant to the following agreement:

"CONSENT

"I, Nathan C. Adams, of Monticello, Minnesota, hereby consent and agree that Norbert J. Goettl and Veronica F. Goettl, co-partners, d/b/a Goettl Feed Service, may sell all laying hens, which I own, or have any interest in, or claim any interest in, and which laying hens are presently located at the Walter Treichel farm at New Ulm, Minnesota, and the Ervin Neubert farm at Mankato, Minnesota, pursuant to the expressed understanding and agreement that all funds, after deducting payments to Ralston-Purina Company, and cost of caring for the laying hens, and also expenses incurred in selling said hens, be applied on my indebtedness, to said partnership.

"Dated this 2nd of February, 1965.

"Nathan C. Adams"

In their complaint plaintiffs do not specifically claim a joint adventure but refer to Adams as an agent and partner of Goettl. The trial court in a memorandum accompanying its decision found that the relationship between Adams and Goettl created a joint adventure. It noted that Adams was to furnish the labor in caring for and feeding the birds and in marketing the eggs. Goettl was to finance the purchase of the birds, provide the feed, and handle the accounting. The court stated:

"* * * Goettl Feed Service was to receive its return on the venture by realizing a profit from the feed furnished, and Nathan C. Adams was to receive his return from the balance of the proceeds after payment of such other expenses as were incurred in the operation."

The court felt the evidence did not establish that title was in Adams or that Goettl was a lienholder. It gave weight to the fact that Goettl was to receive the proceeds from the sale of eggs even after payment for the birds had been completed. Evidence that Goettl examined the housing facilities, deloused the birds, paid delinquent utilities bills, and periodically examined the birds was found to be consistent with a joint adventure.

Plaintiffs advance the following argument:

"\* \* \* By the terms of this agreement Goettl was to receive as its return from the joint adventure an amount equal to the retail sale price of the feed it contributed for the feeding of said pullets, which was to be paid to it before Adams was to receive any of his share. Adams' share of the profits was to consist of all monies remaining after Goettl had first received its share, and after the payment of the purchase price of said pullets and the other expenses incurred in the operation of the joint adventure."

It is plaintiffs' position that had this been a security transaction, Goettl would not have continued to receive the proceeds from the sale of eggs after Ralston-Purina Company had been paid. This argument, however, overlooks the fact that by their agreement Goettl would have continued to finance Adams' feed whether or not the Ralston-Purina debt was ultimately retired. The assignment to Goettl of money realized from the sale of eggs was to apply only on the indebtedness owed to Goettl by Adams, and Goettl was to receive nothing beyond the purchase price of feed. Clearly, Adams and Goettl had wholly unrelated interests in what was received from either the sale of eggs or the sale of the hens. Goettl was not concerned with whether Adams made a profit as long as it was paid for the feed.

The law governing joint adventures was exhaustively considered in an opinion by Mr. Justice Matson in Rehnberg v. Minnesota Homes, Inc. 236 Minn. 230, 52 N. W. (2d) 454. Four elements necessary to constitute a joint adventure were set forth: (a) Contribution by both parties; (b) joint proprietorship and control; (c) a sharing of profits but not necessarily of losses; and (d) a contract. The Rehnberg case found that there was not a sharing of profits since the plaintiff was to receive only the wages of an employee. In National Surety Co. v. Winslow, 143 Minn. 66, 173 N. W. 181, this court applied a rule which we believe governs our holding in the instant case. We held that the payment of a debt out of net profits did not satisfy the element of profit sharing necessary to create a joint adventure and stated (143 Minn. 71, 173 N. W. 183):

"* * * They [the creditors] are entitled to a return of the money loaned or advanced, and stand to lose only in the event there shall be no net profits. The money advanced is not contributed to the enterprise, and must be repaid whether the venture is a success or a failure."

To the same effect are United States v. Westmoreland Manganese Corp. (E. D. Ark.) 134 F. Supp. 898, 924, and Boxwell v. Champagne, 229 Miss. 355, 366, 91 So. (2d) 256, 261. We therefore have no difficulty in holding that a creditor, whose only interest in a business venture is in receiving back his debt, is not engaged in a joint adventure with a debtor merely because he secures an assignment of the proceeds of the sales and from time to time gives advice, pays bills, and takes other measures to protect his security.

Reversed.