Gary ROSENBERG dba Shelter
Consultants, Appellant,

v.

HERITAGE RENOVATIONS, LLC,
and Heritage Marketing, LLC,
Respondents.

No. C7–03–94.

Supreme Court of Minnesota.

July 29, 2004.

Rehearing Denied Aug. 19, 2004.

OPINION

HANSON, Justice.

Appellant Gary Rosenberg, a licensed real estate broker, seeks review of a grant of summary judgment dismissing his claim for commissions on condominium sales that closed after his listing agreement was terminated. The main questions presented are whether Rosenberg's agreement with respondent Heritage Marketing LLC ("Marketing") was terminable-at-will and, if so, whether Rosenberg was due any commissions on purchase agreements or reservation agreements that he obtained before termination but that closed after termination. Inherent in the latter question is the issue whether Minn.Stat. § 82.195 (2002), which regulates the content of real estate listing agreements, should be construed to abrogate a broker's equitable remedy to recover a commission as a procuring cause of a sale that is completed after the listing agreement is terminated. We affirm in part, reverse in part and remand to the district court.

In 1996, Dan Hunt and Arnie Gregory met with Rosenberg to discuss the marketing and sale of approximately 350 individual condominium units in a real estate development that was to be constructed in four phases over several years. In April of 1997, Hunt and Gregory entered into an agreement with Timothy Burnham (doing business as Builders Alliance), as project and sales manager, and Rosenberg (doing business as Shelter Consultants), as sales person.[1] The April agreement contemplated that Hunt, Gregory and Burnham would form a new corporation that would be the party to the agreement with Rosenberg. In fact, while Gregory signed individually, Hunt signed as "Chief Manager, Heritage Marketing, LLC."

Gregory and Hunt subsequently formed two corporations, respondent Heritage Renovations, LLC ("Renovations"), to be the owner and developer of the project, and Marketing, to provide marketing and sales services to Renovations. The April agreement was then replaced in July 1997 by a new agreement that was signed by Gregory and Hunt on behalf of Marketing

---

1. In 1998, Burnham voluntarily withdrew from the project and is not involved with this dispute.

(hereafter the "July Agreement"). The July Agreement describes Rosenberg's role under the heading "Sales Person Proposal." It states that Rosenberg will receive commissions of "2.5% on coop sales and 3.5% on in house sales" and that Rosenberg will receive a draw against commissions of $3,000 per month together with an advance of $1,500 per unit at the time that each purchase agreement was approved. The July Agreement does not explicitly state a date for its expiration, but does state that Rosenberg is "to work the model sales center hours throughout the time frame of the project."

Under a section entitled "Advance Payment to Shelter Consultants [Rosenberg]," the July Agreement provides:

BUILDING 1, 23 UNITS

$1,500 TO BE PAID TO SHELTER CONSULTANTS AT TIME OF APPROVED P.A. BALANCE OF COMMISSION DUE AT CLOSING LESS ANY ACCUMULATED DRAW.

BUILDING 2 AND ALL OTHERS

$500 TO BE PAID TO SHELTER CONSULTANTS AT TIME OF APPROVED P.A. AND ADDITIONAL $1,000 TO BE PAID AT THE TIME OF 50% PRESALE IN EACH BUILDING BALANCE OF COMMISSION TO BE PAID AT CLOSING LESS ANY ACCUMULATED DRAW.

IF A SALE CANCELS MONEY ADVANCED WILL BE CREDITED AGAINST NEXT NEW SALE OR SHELTER CONSULTANTS WOULD PAY BACK THE $1,500.

Rosenberg sold units for phases 1 and 2 from July 1997 through 2000. In September 2000, Rosenberg also began to sell units for phase 3. On February 14, 2001, Marketing sent Rosenberg a fax effectively terminating his services and instructing him to stop selling units on Marketing's behalf. Rosenberg claims that he had al-most 40 purchasers under contract at the time of his termination; 18 as purchase agreements and 20 as reservation agreements. He claims that he is entitled to receive commissions on sales to these purchasers even though the sales were not closed until after his termination. Rosenberg agrees that he has been paid his full commission on all sales that closed before his termination.

Renovations and Marketing moved for summary judgment, arguing that the July Agreement was invalid because it did not include all of the terms required for a "Listing Agreement" under Minn.Stat. § 82.195 (2002). The district court denied Marketing's motion, determining that the July Agreement was valid because it satisfied the critical requirements of the statute and Marketing had waived the right to object to its deficiencies by operating under the Agreement for several years. The court further determined that the Agreement was terminable at will, but that issues of fact were still present as to what Rosenberg was owed. The court dismissed Renovations as an unnecessary party because it was not named in the July Agreement.

After continued discovery, Rosenberg moved to amend his complaint to include a claim that the arrangement between the parties was actually a joint venture. Marketing renewed its motion for summary judgment. The district court denied Rosenberg's motion to amend and granted Marketing's motion for summary judgment, determining that Rosenberg had been lawfully terminated and that he had been paid all commissions due to him through his termination date. The court concluded that Rosenberg's failure to include an "override clause" in the July Agreement, as authorized by Minn.Stat. § 82.195, precluded any claim for commis-

sions on sales that closed after his termination date.[2]

The court of appeals affirmed, concluding that (1) the July Agreement did not create a joint venture and (2) summary judgment was appropriate because the July Agreement was terminable at will and Rosenberg had been paid all of the commissions due at the time of termination. *Rosenberg v. Heritage Renovations, LLC,* No. C7–03–94, 2003 WL 21694604 at *2–4 (Minn.App. July 22, 2003) (unpublished opinion). We granted review.

▮▮▮ On an appeal from summary judgment, we must determine whether (1) there exist any genuine issues of material fact, and (2) whether the district court correctly applied the law. *Denelsbeck v. Wells Fargo & Co.,* 666 N.W.2d 339, 345 (Minn.2003). We view the evidence in a light most favorable to the nonmoving party. *Id.* The construction of a contract, unless ambiguous, is a question of law, as is the construction of a statute. *Id.* at 346. Questions of law are reviewed by this court de novo. *Id.* at 345.

## I.

▮▮▮ Marketing argues that the July Agreement is void, and Rosenberg's action cannot be brought, because the July Agreement does not contain all of the "contents" of a listing agreement that are specified in Minn.Stat. § 82.195, subd. 2 (2002). As relevant here, the required "contents" include:

All listing agreements must be in writing and must include:

(1) a definite expiration date;

(2) a description of the real property involved;

(3) the list price and any terms required by the seller;

(4) the amount of any compensation or commission or the basis for computing the commission;

(5) a clear statement explaining the events or conditions that will entitle a broker to a commission;

(6) information regarding an override clause, if applicable, including a statement to the effect that the override clause will not be effective unless the licensee supplies the seller with a protective list within 72 hours after the expiration of the listing agreement;

\*  \*  \*  \*  \*  \*

(10) for residential listings, a notice stating that after the expiration of the listing agreement, the seller will not be obligated to pay the licensee a fee or commission if the seller has executed another valid listing agreement pursuant to which the seller is obligated to pay a fee or commission to another licensee for the sale, lease, or exchange of the real property in question. This notice may be used in the listing agreement for any other type of real estate.

*Id.* Marketing argues that the July Agreement is deficient in that, among other things, it failed to include "a definite expiration date" or "information regarding an override clause."

Rosenberg argues that the only statutory section relevant to this action is Minn.

---

**2.** Section 82.195 does not define an "override clause." Black's Law Dictionary defines "override" as follows:

A commission paid to a real-estate broker who listed a property when, within a reasonable time after the expiration of the listing, the owner sells the property directly to a buyer with whom the broker had negotiated during the term of the listing.

Black's Law Dictionary 1129 (7th ed.1999).

Stat. § 82.33 (2002). That section specifically addresses "Civil Actions" for the "collection of compensation" by a "duly licensed real estate broker" and is in the form of a statute of frauds; that is, it states "No person shall bring or maintain any action" for commissions unless he was a duly licensed real estate broker at the time the cause of action arose and "there is a written agreement with the person required to be licensed." Minn.Stat. § 82.33, subds. 1 & 2 (2002). Rosenberg argues that he was duly licensed and the July Agreement satisfied the requirement for a writing.

The district court determined that section 82.195 applied but ruled that the July Agreement was valid because it substantially complied with section 82.195 and Marketing had waived any deficiencies by its course of conduct.

*Substantial Compliance*

In *Rueben v. Gibbs*, 297 Minn. 321, 322–23, 210 N.W.2d 857, 858 (1973), we addressed a previous statutory requirement that a listing agreement be in writing before the real estate broker can maintain an action for a commission. There, the broker had written an informal sales agreement after the seller had signed a purchase agreement with the buyer. *Id.* at 322–23, 210 N.W.2d at 858. We observed that there were no rules or statutes defining the contents of a listing agreement.

*Id.* at 323, 210 N.W.2d at 858. We concluded that the informal sales agreement substantially complied with the statute because it described the commission and provided an authorization to sell. *Id.*, 210 N.W.2d at 858.

After *Rueben*, the Minnesota Commerce Department promulgated a rule that delineated the requirements for a listing agreement.[3] This rule was substantially similar to and was later codified in Minn.Stat. § 82.195. We have not had the opportunity to address the question of whether section 82.195 or the predecessor rule required strict or only substantial compliance. The court of appeals did so in *R.M. Parranto Co. v. Bernick*, 354 N.W.2d 600, 603 (Minn. App.1984). The court of appeals concluded that the substantial compliance doctrine of *Rueben* applied to the rule. *Id.* The court held that the writing in question satisfied the requirements under both the statute and the rule even though it did not contain a definite expiration date. *Id.*[4] We agree with *R.M. Parranto Co.* and hold that the substantial compliance doctrine of *Rueben* applies to section 82.195.

*Course of Dealing*

Even if section 82.195 were viewed as a statute of frauds, we have generally recognized that the requirements of a statute of frauds may be superceded by the parties' performance. *Berg v. Carlstrom*, 347

---

**3.** The rule was first promulgated by the Commerce Department in 1982 as Minn. R. 2800.3800, was later renumbered 2805.1200, and eventually was repealed by Act of May 20, 1993, ch. 309, § 32, 1993 Minn. Laws 1814. *See* Eileen Roberts, *Minnesota Practice–Real Estate Law* § 1.11 (2003).

**4.** *See also MacDonald v. Roderick*, 158 Vt. 1, 603 A.2d 369, 372 (1992):

When * * * the claim is that the violation occurred because of failure to use required language or because of the omission or misstatement of a required term, there will be no effect on the broker's right to recover

a commission unless the violation makes recovery unfair in the particular case before the court.

*But see Brian Props., Inc. v. Burley*, 278 Ill. App.3d 272, 214 Ill.Dec. 956, 662 N.E.2d 522, 525 (1996) (holding that an agreement that violated the requirements of the licensing act by omitting a definite expiration date was void); *Bangle v. Holland Realty Invest.*, 80 Nev. 331, 393 P.2d 138, 140 (1964) ("[e]nforcement [of the agreement] is precluded because of its failure to contain a definite termination date.").

N.W.2d 809, 812 (Minn.1984) ("An agreement may be taken out of the statute of frauds * * * by part performance * * *."); *Doyle v. Wohlrabe,* 243 Minn. 107, 110, 66 N.W.2d 757, 761 (1954) ("That adherence to the strict letter of the statute or perfection in the drafting of the written conveyance are not ends in themselves is illustrated by the equitable doctrine that the statute may not be used as an instrument of fraud and that part performance may, in some instances, place the transaction wholly outside the statute."). This was the view taken by the Wyoming Supreme Court of an oral real estate listing agreement in *Wyoming Realty Co. v. Cook,* 872 P.2d 551, 554 (Wyo.1994) (holding that, because the statute of frauds can be satisfied by full performance of one of the parties, the lack of a written listing agreement would not bar enforcement of the oral agreement).

The district court's conclusions, that the July Agreement substantially complied with section 82.195 and that Marketing waived its objections to any deficiencies by a course of dealing, reflect the sound application of these principles. The July Agreement did contain the essential contents required by section 82.195 and the extensive performance by both parties satisfied any statute of frauds aspects of section 82.195.

## II.

Our conclusion that the July Agreement is a valid listing agreement brings us to the question of whether the Agreement extends for the entire 4–phase project or is terminable at will. Under Minnesota law, an employment agreement with no definite expiration date is presumed to be at will. *Martens v. Minnesota Min. & Mfg. Co.,* 616 N.W.2d 732, 741 (Minn.2000). In *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983), we said that "[w]here the hiring is for an indefinite term, * * * the employment is said to be 'at-will.' This means that the employer can summarily dismiss the employee for any reason or no reason * * *."

The July Agreement does not express a definite termination date. It refers to some events that could be used to determine a termination date, such as the reference to "the time frame of the project" or to "Building 2 and All Others." But it is not clear that these references were intended to describe the termination event because they are incidental to other terms that do not deal with termination.[5]

Rosenberg does not argue that different legal principles apply to listing agreements, but instead argues that the July Agreement is not silent on the issue of duration. Rosenberg argues that the duration was defined by an event, not a date, because no one knew when the sale of these multiple units would be completed. He suggests that the duration was to be until the last unit was sold.

Because there is no definite date in the contract or even an event from which one could reasonably determine a definite date, we hold that the district court could properly conclude that the lack of a specific termination date rendered the July Agreement terminable at will.

## III.

The conclusion that the July Agreement is terminable at will presents the next

---

5. In *Lapadat v. Clapp–Thomssen Co.,* 397 N.W.2d 606, 609 (Minn.App.1986), the court of appeals applied the principles of employment law to determine that a real estate broker's agreement to act as sales manager for a brokerage firm was terminable at will, stating: "[t]he April Agreement is silent on the issue of duration; as a result, it is terminable at will as a matter of law."

question: what commissions, if any, did Rosenberg earn prior to his termination? This question requires us to look both at the terms of the July Agreement and at the equitable "procuring cause" remedy.

*Earned Commissions*

█ Generally, a broker earns his commission "when he has performed all that he undertook to perform." *Greer v. Kooiker*, 312 Minn. 499, 510, 253 N.W.2d 133, 141 (1977). But what constitutes a broker's full performance depends on the exact agreement between the broker and the seller. *Olson v. Penkert*, 252 Minn. 334, 342, 90 N.W.2d 193, 200 (1958). In *Olson*, we said:

> The great weight of authority is that, *unless the broker and his employer have expressly stipulated to the contrary*, the broker is entitled to his compensation upon the completion of the negotiations which he undertook, irrespective of whether or not the contract negotiated is actually consummated or whether the failure to complete the contract is due to the default or refusal of the employer or to that of the party procured by the broker, so long as the failure to carry it through is not due to any fault of the broker or so long as he has not been guilty of fraud or bad faith.

*Id.* at 344, 201, 90 N.W.2d at 201 (emphasis added).

Rosenberg argues that he earned his commission when he obtained signed purchase agreements, but applying *Olson*, we conclude that the parties have "expressly stipulated to the contrary." The July Agreement specifies that if a sale does not ultimately close, any advance given to Rosenberg for the purchase agreement would be refunded or applied to the next

signed purchase agreement. Accordingly, the claim for commissions cannot be decided on the simple ground that Rosenberg had earned the commissions when the purchase agreements were signed.

*Procuring Cause*

█ In *Spring Co. v. Holle*, 248 Minn. 51, 55, 78 N.W.2d 315, 318 (1956), we recognized that a broker has a right to a commission when the broker has been the procuring cause for the sale, even though the sale is completed after the listing agreement has terminated and the commission had not been earned prior to termination.[6] As stated in *Olson*, this rule is based on the contract principle that "no one can avail himself of the nonperformance of a condition precedent who has himself occasioned its nonperformance." 252 Minn. at 343, 90 N.W.2d at 200.

As applied here, this rule would lead to the conclusion that, because the termination of Rosenberg by Marketing caused the nonperformance of the closing, which was the only remaining condition for Rosenberg to earn commissions, Marketing cannot rely on the failure of that condition and is liable for commissions on all sales for which Rosenberg was the procuring cause. This conclusion brings us to the question of whether the common law remedy for a real estate broker who was the procuring cause of a sale has been abrogated by section 82.195, and replaced with the statutory "override" remedy.

█ Generally, statutes in derogation of the common law are to be strictly construed. *Shaw Acquisition Co. v. Bank of Elk River*, 639 N.W.2d 873, 877 (Minn. 2002); *Bloom v. Am. Express Co.*, 222 Minn. 249, 253, 23 N.W.2d 570, 573 (1946).

---

**6.** Minnesota has recognized the procuring cause remedy in numerous cases spanning several decades. *See Wright v. M.B. Hagen Realty Co.*, 269 N.W.2d 62, 66 (Minn.1978); *Stead v. Erickson*, 182 Minn. 469, 471, 234 N.W. 678, 679 (1931); *Armstrong v. Wann*, 29 Minn. 126, 127, 12 N.W. 345, 346 (1882).

*See also* 73 Am.Jur.2d Statutes § 191 (2001) "[I]t is not presumed that the legislature intended to abrogate or modify a rule of the common law on the subject any further than that which is expressly declared or clearly indicated."). In addition, statutes that are in derogation of an equitable remedy are likewise to be strictly construed so as not to "supplant[ ], impair[ ] or restrict[ ] equity's normal function as an aid to complete justice." *Swogger v. Taylor*, 243 Minn. 458, 465, 68 N.W.2d 376, 382 (1955). *See also* In re *Lakeland Dev. Corp.*, 277 Minn. 432, 442, 152 N.W.2d 758, 765 (1967)).

One proposed interpretation of section 82.195 is that it provides an alternative remedy, allowing brokers to establish a right to commissions even where they were not the procuring cause, but then limits access to that more liberal remedy by requiring that the listing agreement include the precise terms, and that the broker take the precise actions, specified in section 82.195. This interpretation is consistent with the permissive nature of section 82.195, which does not mandate override clauses, but only describes what such clauses must contain if they are included. This interpretation is also supported by the fact that the override remedy is much broader than the procuring cause remedy. For the procuring cause remedy, "there must be evidence that [the broker] originated a course of events which without a break in their continuity created a cause of which the sale was the result. It is not enough that his services merely contributed to the result. They must be the producing and effective means thereof." *Spring Co.*, 248 Minn. at 56, 78 N.W.2d at 318. The standard override clause, on the other hand, can preserve the right to a commission for the sale to any person who merely contacted the broker

or who showed an interest in the property during the term of the listing. Minn.Stat. § 82.195, subd. 5 (2002).

A second proposed interpretation of section 82.195 is that it so comprehensively addresses the subject of the effect of the termination of a listing agreement on a broker's right to commissions that the statutory override remedy was intended to be exclusive. In *Lynn Beechler Realty Co. v. Warnygora*, 396 N.W.2d 717, 720 (Minn. App.1986), the court of appeals held that the administrative rule that preceded section 82.195, and authorized an override remedy, superceded the procuring cause principles recognized in *Spring Co.* The court of appeals held that the failure of the broker to provide a protective customer list within 72 hours after the expiration of the listing agreement precluded the broker's claim for any commission. *Lynn Beechler Realty Co.*, 396 N.W.2d at 720. The court did not explain why the requirements of the rule regarding override clauses (now section 82.195) abrogated the procuring cause remedy, except to say that *Spring Co.* preceded the rule. *Lynn Beechler Realty Co.*, 396 N.W.2d at 720.

There are several factors that weigh against the conclusion that the override remedy authorized by section 82.195 was intended to be exclusive, and these factors suggest that the court of appeals decision in *Lynn Beechler Realty Co.* was not correct.

First, section 82.195 makes no explicit reference to the procuring cause remedy and does not state that the override remedy displaces any other remedies that might be available at common law. In many instances where the legislature has intended to replace a common law remedy with a statutory one, it has done so expressly.[7] Here, the legislature did not in-

---

7. Thus, for example, Minnesota's Workers' Compensation law provides:

clude any language in chapter 82 to expressly abrogate or modify any common law remedies.

Second, and more importantly, the legislature expressly disclaimed any intent to abrogate the common law in the "Scope and Effect" section of chapter 82. When chapter 82 was first enacted, the legislature described the scope and effect of the chapter as follows: "The requirement for disclosure of agency relationships set forth in this chapter are intended only to establish a minimum standard for regulatory purposes, and *are not intended to abrogate common law.*" Act of May 20, 1993, ch. 309, § 9, 1993 Minn. Laws 1794, 1801 (emphasis added). In 1994, this scope and effect language was amended, but the amendment reinforced the idea that the statute did not replace the common law, providing: "Disclosures made in accordance with the requirements for disclosure of agency relationships set forth in this chapter are sufficient to satisfy common law disclosure requirements." Minn. Stat. § 82.197, subd. 3 (2002). Thus, the initial version of section 82.197 expressly disclaimed any intent to abrogate the common law and the amended version expressly recognized that common law requirements continue to exist and are not replaced by the statute.

Third, we have been reluctant to imply an intent to abrogate a common law right where the statute does not do so expressly. This is particularly true with respect to equitable principles and remedies. Thus,

in *Swogger*, 243 Minn. at 464, 68 N.W.2d at 382, we said that equity "functions as a supplement to the rest of the law where its remedies are inadequate to do complete justice." We held that in the absence of express language or necessary implication, the partition statute, which had modified the procedures for partition actions be interpreted as restricting the court's equitable jurisdiction to consider other plans where necessary to provide complete justice. *Id.* at 464–65, 68 N.W.2d at 382. We said:

> Statutory enactments, even though they provide new procedures to enforce pre-existing rights at law and in equity, are to be read in harmony with the existing body of law, inclusive of existing equitable principles, unless an intention to change or repeal it is apparent.

*Id.* at 465, 68 N.W.2d at 382.

Similarly, we have said that even though the statutes governing the dissolution of a corporation prescribed specific procedures and grounds for dissolution, the statute should not be construed as eliminating the court's pre-existing powers in equity. *Lakeland Dev. Corp.*, 277 Minn. at 441, 152 N.W.2d at 764–65. Thus we recognized that the court's authority by statute to dissolve a corporation was an alternative remedy that did not eliminate the court's general equitable power to do so. As applied here, all would likely agree that the strict application of section 82.195 to deprive Rosenberg of any recovery of compensation for extensive work that pro-

The liability of an employer prescribed by this chapter is exclusive and in the place of any other liability to such employee, personal representative, surviving spouse, parent, any child, dependent, next of kin, or other person entitled to recover damages on account of such injury or death.
Minn.Stat. § 176.031 (2002). And Minnesota's No–Fault Automobile Insurance statute modifies the common law "action in negli-

gence accruing as a result of injury arising out of the operation, ownership, maintenance or use of a motor vehicle" by providing that, in such an action, "no person shall recover damages for noneconomic detriment unless" the sum of specified damage elements exceeds $4,000 or the injury results in permanent disfigurement, permanent injury, death or disability for 60 days or more. Minn.Stat. § 65B.51, subds. 1 and 3 (2002).

duced significant benefit to Marketing would not do complete equity.

Fourth, as noted earlier, the permissive language of section 82.195 does not suggest an intention of exclusion. The statute does not require that an override clause be included in a listing agreement but treats it as optional-"if applicable." Moreover, the only language that could be construed as restricting civil actions on a listing agreement is subdivision 4, which is narrowly limited to proscribe that "Licensees shall not seek to enforce an override clause unless * * *." Minn.Stat. § 82.195, subd. 4(a) (2002). Rosenberg does not seek to enforce an override clause in this action and thus does not violate the statute's only proscription.

The dissent's reliance on subdivision 2(5) of section 82.195 is misplaced. The requirement in that subdivision that all listing agreements contain "a clear statement explaining the events or conditions that will entitle a broker to a commission" addresses the question of when commissions are contractually earned. As we discussed earlier, the July Agreement did explain how commissions were to be contractually earned, and we have concluded that because Rosenberg did not earn any further commissions under the July Agreement, he had no contract remedy. But the procuring cause doctrine is an equitable remedy that is only available where there is no contract remedy; that is, where commissions were not contractually earned at the time of termination. We do not read subdivision 2(5) (or any other statute of frauds provision, for that matter) as requiring that a party seeking an extra-contractual, equitable remedy must first show that the contract expressly gave notice that the equitable remedy might be available.

Weighing all of these considerations, we conclude that the override remedy provided in section 82.195 was intended to provide an alternative to, but not to abrogate, the court's equitable authority to use the procuring cause remedy where necessary to do complete equity.[8] A similar conclusion was reached by the Colorado Court of Appeals in *Telluride Real Estate Co. v. Penthouse Affiliates, LLC*, 996 P.2d 151, 154 (Colo.App.1999). The court rejected the argument that a statute regulating the relationships between real estate brokers and sellers was intended to supplant existing common law, holding that the statute did not eliminate the common law procuring cause remedy.

Because genuine issues of material fact exist with respect to Rosenberg's procuring cause claims, we reverse the grant of summary judgment for Marketing and remand for trial of those claims.

## IV.

Our reversal of summary judgment for Marketing necessitates a review of Rosenberg's claim against Renovations. Rosenberg contends that the district court erred in dismissing all claims against Renovations because Marketing was acting as an agent for Renovations and he should be able to pursue both corporations. Market-

---

8. One article specifically recognizes that the override clause provides an alternative to the procuring cause remedy (referring to the override clause as an "extension clause"):

The purpose of an extension clause is often misunderstood. In some cases the broker was held to be entitled to his commission only if he could show that he was the "procuring cause" of the sale. As has been noted, this analysis is correct only if no extension clause exists. The very reason for the extension clause is to afford the broker additional protections not allowed by the procuring cause doctrine.

John M. Norwood & Cornelius J. Hyde, *Extension Clauses in Louisiana Listing Agreements*, 42 La. L.Rev. 1011, 1012–13 (1982) (footnote omitted).

ing argues that the district court correctly dismissed Renovations as a party because Renovations was not a party in the listing agreement. Marketing also argues that Marketing was not an "agent" for Renovations because Renovations did not have continuous control over Marketing.

The court of appeals did not address the "agency" issue because it held that there was no valid claim against Marketing and, thus, there could be no valid claim against Renovations. *Rosenberg,* 2003 WL 21694604, at *4. But, because we reverse the decision of the court of appeals on the procuring cause claim against Marketing, the issue of whether Rosenberg has stated a valid claim against Renovations takes on renewed significance.

Rosenberg argues that the rules of civil procedure do not authorize the dismissal of a party merely on grounds that the party is not "necessary." It is true that the district court's use of the word "necessary" was a misnomer. The concept of a necessary party only arises where a party is *not* joined and that party's presence in the action is necessary to the ability of the court to grant complete relief or avoid inconsistent obligations. Minn. R. Civ. P. 19.01. A plaintiff has the right to join a person against whom the plaintiff can state a claim, even though the joinder of that person is not technically "necessary" but only "permissive." Minn. R. Civ. P. 20.01.

The question is whether Rosenberg has stated a claim against Renovations, which turns on the question whether Renovations should be considered a party, albeit unnamed, to the July Agreement. According to the Restatement, a disclosed principal "is subject to liability upon an authorized contract in writing * * * although it purports to be the contract of the agent, unless the principal is excluded as a party by the terms of the instrument or by the agreement of the parties." Restatement

(Second) of Agency § 149 (1958). The comments state:

> The fact that the principal's name is not in the instrument and that there is no appearance of agency upon the writing is some evidence that the parties intended that the agent alone was to be liable. However, it is not sufficient evidence to rebut the inference that a disclosed or partially disclosed principal is a party to a contract made by his agent.
>
> Upon the question whether or not, under the circumstances, the third person accepted the credit of the agent only, the written memorandum binding the agent is not conclusive evidence, unless by its specific terms the principal is excluded as a party.

*Id.* at cmt. a. The same rule applies to undisclosed principals: "[a]n undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority." *Id.* at § 186. And the rule is not changed by the fact the contract must be in writing. *Id.* at §§ 153 and 193. Section 82.195 recognizes the possibility that a listing agreement may be signed by an agent by stating that a listing agreement may be signed either by the owner or "another person authorized to offer the property for sale." Minn.Stat. § 82.195, subd. 1 (2002).

Evidence supporting the view that Renovations was intended to be a party to the July Agreement includes the fact that commission payments to Rosenberg were made by Renovations, not Marketing; the Reservation Agreements identify Renovations as "Seller" and Rosenberg's company, Shelter Consultants, as "Seller's agent"; and the New Construction Purchase Agreements likewise list Rosenberg as "Seller's Agent." Further, the May 1997 Agreement between Renovations and Marketing has a provision for "subcontracts" which authorized Marketing to

provide services to Renovations through subcontractors, subject to approval by Renovations.

Because the district court did not address these agency issues and dismissed Renovations on an inappropriate ground, Rosenberg was not given a full opportunity to present a record on these agency issues. The record that does exist is sufficient to preclude dismissal of Renovations under either Minn. R. Civ. P. 12 or 56. We reverse the summary judgment dismissing Rosenberg's claims against Renovations.

## V.

■ Finally, Rosenberg argues that the district court erred in denying his motion to amend his complaint to include a claim for breach of a joint venture. A party may amend its complaint after a responsive pleading is served only by leave of the court. Minn. R. Civ. P. 15.01. We have stated that the amendment of pleadings should be liberally allowed unless the adverse party would be prejudiced. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993). But we have cautioned that the court should deny a motion to amend a complaint where the proposed claim could not withstand summary judgment. *M.H. v. Caritas Family Services*, 488 N.W.2d 282, 290 (Minn.1992).

■ Under Minnesota law, four requirements must be met in order to create a joint venture. These four requirements are "(1) contribution by all parties, (2) joint

proprietorship and control, (3) sharing of profits but not necessarily of losses, and (4) a contract." *Delgado v. Lohmar*, 289 N.W.2d 479, 482 n. 2 (Minn.1979) (citing *Treichel v. Adams*, 280 Minn. 132, 158 N.W.2d 263 (1968); *Rehnberg v. Minnesota Homes, Inc.*, 236 Minn. 230, 52 N.W.2d 454 (1952)). Although it appears that Rosenberg may have participated in the initial stages of the development, he provides no evidence that he had joint proprietorship or control or that he was to share in the profits of the development. To the contrary, the listing agreement states that Rosenberg was employed as a salesperson for specified commissions. And the parties' conduct under the listing agreement demonstrates that they regarded Rosenberg as a commission agent, not a joint venturer.

We conclude that the district court did not abuse its discretion when it denied Rosenberg's motion to amend because the claim of a joint venture would not survive a summary judgment motion.

Affirmed in part, reversed in part and remanded.

ANDERSON, Russell A. (dissenting).

Because the majority ignores both the intent of the legislature and our longstanding precedent, I respectfully dissent. Chapter 82 of the Minnesota Statutes is a comprehensive and mandatory statutory scheme for the regulation of real estate brokers and salespersons.[1] No person is

---

1. There can be no disputing the fact that licensed real estate brokers are required to comply with the provisions of chapter 82. The mandatory nature of Minn.Stat. § 82.195 (2002) is evidenced by the terms utilized by the legislature:

> **Subdivision 1. Requirement.** Licensees *shall* obtain a signed listing agreement or other signed written authorization from the owner of real property * * *.
> * * * *

**Subd. 2. Contents.** All listing agreements *must* be in writing and *must* include: (1) a definite expiration date;
* * * *

(5) *a clear statement explaining the events or conditions that will entitle a broker to a commission;*

(6) information regarding an override clause, if applicable, including a statement to the effect that the override clause will not be effective unless the licensee supplies the

to act as a real estate broker, salesperson, or real estate closing agent unless licensed. Minn.Stat. § 82.19, subd. 1 (2002). In fact, we have made clear that an unlicensed real estate broker may not maintain an action for the collection of a commission. *Relocation Realty Services Corp. v. Carlson Companies, Inc.*, 264 N.W.2d 643, 645 (Minn.1978); *accord Dellwood Enter., Inc. v. Pac. Am. Real Estate Fund*, 505 F.Supp. 187, 189 (D.Minn.), *aff'd*, 653 F.2d 350 (8th Cir.1981).

In addition to requiring a license to maintain an action such as this, brokers, such as Rosenberg, are required to obtain a signed listing agreement that includes, among other things, "a clear statement explaining the events or conditions that will entitle a broker to a commission." Minn.Stat. § 82.195, subd. 2(5) (2002). A broker "shall not" seek to enforce an override clause unless a protective list has been furnished to the seller within 72 hours after the expiration of the listing agreement. Minn.Stat. § 82.195, subd. 4 (2002). *See also Douglas v. Schuette*, 607 N.W.2d 142, 145 (Minn.App.2000); *Lynn Beechler Realty Co. v. Warnygora*, 396 N.W.2d 717, 720 (Minn.App.1986). The length of the override provision may not extend more than 6 months beyond the expiration of the listing agreement and, with exception not applicable here, a broker "shall not" include in a listing agreement a holdover clause, automatic extension, "or any similar provision * * *." Minn.Stat. § 82.195, subd. 3 (2002).

The majority apparently believes that beneath these clear and comprehensive statutory requirements and prohibitions is a surviving common law equitable remedy which allows a broker to recover a commission when the broker is the procuring cause of a sale completed after termination of the listing agreement. In my view, the majority has read into this listing agreement a "similar provision" to an override clause that the legislature has clearly prohibited. *See* Minn.Stat. § 82.195, subd. 3. The listing agreement that Rosenberg seeks to enforce has no override clause that would allow, upon proper notice, recovery of commissions after termination of the listing agreement. The common law principle relied upon by the majority is nowhere referenced in the listing agreement, which, according to statute, must contain "a clear statement explaining the events or conditions that will entitle a broker to a commission." Minn.Stat. § 82.195, subd. 2(5). When the legislature provides that events or conditions that will entitle a broker to a commission must be explained in a "clear statement" in the listing agreement, I would conclude that a common law claim, neither mentioned nor explained by a clear statement in a listing agreement, is barred.

The majority relies on a *specific* (and since amended) section of chapter 82 for the proposition that the legislature intended *no portion* of chapter 82 to abrogate the common law. The section cited by the majority, however, Minn.Stat. § 82.197, subd. 3 (2002), by its very terms applied

---

seller with a protective list within 72 hours after the expiration of the listing agreement; * * * *

**Subd. 3. Prohibited transactions.** Except as otherwise provided in subdivision 4, paragraph (b), licensees *shall not* include in a listing agreement a holdover clause, automatic extension, or any similar provision,

or an override clause the length of which is more than six months after the expiration of the listing agreement.

**Subd. 4. Override clauses.** (a) Licensees *shall not* seek to enforce an override clause unless a protective list has been furnished to the seller within 72 hours after the expiration of the listing agreement.

Minn.Stat. § 92.195 (2002) (emphasis added).

only to "the requirements for *disclosure of agency relationships* set forth in this chapter." (Emphasis added.) Because the dispute before us does not involve the disclosure of an agency relationship, but rather the adequacy of the listing agreement, Minn.Stat. § 82.197 is wholly irrelevant.

By his own admittance, Rosenberg, a licensed real estate broker with over 20 years of experience, failed to comply with the express statutory provisions that would allow entitlement to a commission after termination of the listing agreement. *See Marks v. Walter G. McCarty Corp.*, 33 Cal.2d 814, 205 P.2d 1025, 1030 (1949) ("The plaintiff [a licensed real estate broker], a man of experience in this line of business, knew how to protect himself in the transaction but failed to do so."). I would not enforce a remedy that the legislature has prohibited. I respectfully dissent.

BLATZ, C.J. (dissenting).

I join in the dissent of Justice Russell A. Anderson.