**Oluf JOHNSON, et al., Appellants,**

v.

**PAYNESVILLE FARMERS UNION COOPERATIVE OIL COMPANY, Respondent.**

**Nos. A10–1596, A10–2135.**

Court of Appeals of Minnesota.

July 25, 2011.

Arlo H. Vande Vegte, Arlo H. Vande Vegte, P.A., Plymouth, MN, for appellants.

Kevin F. Gray, Matthew W. Moehrle, Rajkowski Hansmeier, Ltd., St. Cloud, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; STAUBER, Judge; and HARTEN, Judge.*

## OPINION

ROSS, Judge.

Organic farmers Oluf and Debra Johnson filed a civil suit alleging that the Paynesville Farmers Union Cooperative Oil Company sprayed a chemical pesticide that drifted from pesticide-targeted fields onto theirs, and that this prevented them from selling their crops under a federal nonpesticide "organic" certification. The district court granted summary judgment and dismissed the Johnsons' trespass, nuisance, and negligence per se claims. We hold that pesticide drifting from one farm to another may in some circumstances constitute a trespass. And we hold that the federal regulation that prohibits the sale of produce labeled organic if it is tainted with chemicals at levels greater than five percent of the EPA's specified limit does not, by reverse implication, automatically authorize the sale of organically labeled produce that does not fail that five-percent test. We therefore reverse the district court's dismissal of the Johnsons' claims, its denial of the Johnsons' motion to amend their complaint to include claims related to other incidents of chemical drift, and its order denying a permanent injunction, and we remand for further proceedings.

## FACTS

For the purposes of this appeal from summary judgment, we assume the following facts, which we perceive to be either undisputed or the reasonable inferences of disputed facts construed in the light most favorable to the Johnsons as the nonmoving parties.

In the 1990s, Oluf and Debra Johnson began the three-year process of converting their conventional family farm to a certified-organic farm to realize the higher market prices for organic produce and seeds. Oluf Johnson posted signs at the farm's perimeter indicating that it was chemical free, maintained a buffer zone between his organic fields and his chemical-using neighbors' farms, and implemented a detailed crop-rotation plan. He also notified commercial pesticide sprayer Paynseville Farmers Union Cooperative Oil Company of the transition. He specifically asked the cooperative to take precau-

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

tions to avoid overspraying pesticide onto his fields when treating adjacent fields.

Despite the Johnsons' requests, in 1998, 2002, 2005, 2007, and 2008, the cooperative sprayed pesticide and herbicide on fields adjacent to theirs in a manner that violated Minnesota law, causing chemicals to land on the Johnsons' farm.[1] Oluf Johnson complained to the cooperative after the 1998 incident, and it apologized, promising to "make it right." But when the Johnsons gave the cooperative an invoice documenting their losses from the overspray, the cooperative refused to pay.

Oluf Johnson complained to the Minnesota Department of Agriculture (MDA) after the 2002 overspray. The MDA investigated and determined that the cooperative illegally sprayed herbicide, causing visually apparent tainting of the Johnsons' crops consistent with drift. Johnson sold his herbicide-tainted crops at lower, nonorganic prices and, as required by federal regulation, removed the tainted field from organic production for three years. The Johnsons settled their losses with the cooperative for that incident. Under that settlement, the cooperative paid damages and agreed to give the Johnsons 24 hours' notice before it sprayed in any adjacent field.

The cooperative oversprayed adjacent fields again in 2005 and the Johnsons again contacted the MDA. The MDA investigated, found drift, and instructed the Johnsons to burn their contaminated alfalfa. In addition to losing the tainted alfalfa, the Johnsons could not grow anything on the burn spot and took the contaminated field out of organic production for three years.

The cooperative again oversprayed in 2007. Johnson again contacted the MDA, and after investigating the MDA required Johnson to plow under a 175–foot wide strip of soybeans running the entire length of his field. He was also told by the state's organic certifying agent that if any pesticide residue was detected, he must take the field out of organic production for three years. The MDA detected pesticide residue, and so Johnson took the field out of organic production.

Johnson again notified the MDA in 2008 about the cooperative's spraying in July and August. He smelled chemicals in the air over his field, leaving him with "cottonmouth, headache and nausea" and his wife a headache and nausea. The MDA investigated and again cited the cooperative for illegally spraying, and the Johnsons again took the affected fields out of organic production for three years. He plowed part of the alfalfa field under because it was "becoming choked with weeds and the alfalfa was very sick and poor."

In January 2009, the Johnsons sued the cooperative for the 2005 and 2007 incidents. They asked the district court to enjoin the cooperative from spraying within one-half mile of their farm and for damages based on common-law theories of trespass, nuisance, negligence per se, and battery. In June 2009, the district court granted a temporary injunction, prohibiting the cooperative from spraying within one-quarter mile of the Johnsons' farm and requiring it to give notice of its spraying activities in the area.

In April 2010, the Johnsons moved to amend their complaint to include damages from the 2008 incidents.

---

1. The cooperative was cited four times by the Minnesota Department of Agriculture for violating pesticide laws, which make it illegal to "apply a pesticide resulting in damage to adjacent property," Minn.Stat. § 18B.07, subd. 2(b) (2010), and to spray pesticide in a manner "inconsistent with a label or labeling," Minn.Stat. § 18B.07, subd. 2(a)(1) (2010). Pesticide labels generally prohibit use when the wind is in excess of five miles per hour. The MDA found that the cooperative repeatedly applied pesticide on windy days.

The district court granted summary judgment in the cooperative's favor and dismissed all of the Johnsons' claims. It concluded that the claims arising from the 2005 overspray are time barred. Regarding the 2007 overspray, the district court dismissed the trespass claim because it concluded that "trespass by particulate matter" is not recognized in Minnesota; it dismissed the nuisance and negligence-per-se claims because the Johnsons presented no evidence that the cooperative's spraying caused damages; and it dismissed the battery claim for lack of evidence of intent. The district court also denied the Johnsons' motion to amend their complaint, reasoning that the claims arising from the 2008 overspray would fail for the same reasons the 2007–overspray claims failed. The district court consequently denied the Johnsons' request for permanent injunctive relief. The Johnsons appeal.

## ISSUES

I. Did the district court err by concluding that pesticide drift cannot constitute trespass as a matter of law?

II. Did the district court err by dismissing the Johnsons' nuisance and negligence-per-se claims after concluding that the Johnsons failed to allege that the cooperative caused damages?

III. Did the district court err by refusing to allow the Johnsons to amend their complaint?

IV. Did the district court err by dissolving the temporary injunction and denying permanent injunctive relief?

## ANALYSIS

■■■ This is an appeal from summary judgment. "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. State, Dep't of Natural Res.,* 693 N.W.2d 181, 186 (Minn.2005). We review both elements de novo. *Id.*

## I

■■■ We first address the district court's conclusion that chemical pesticide drift cannot constitute a trespass. No Minnesota case has addressed whether unwanted pesticide drift from a targeted field to an adjacent otherwise organic farming operation can constitute a trespass. We hold that it can.

■■■ A trespass claimant must prove two elements: the plaintiff's rightful possession and the defendant's unlawful entry. *Special Force Ministries v. WCCO Television,* 584 N.W.2d 789, 792–93 (Minn.App. 1998), *review denied* (Minn. Dec. 15, 1998). There is no dispute about the Johnsons' rightful possession of their fields. So the only question is whether the cooperative's unlawful spraying of the chemical pesticide causing it to drift onto the Johnsons' otherwise chemical-free fields constitutes an unlawful entry.

The district court relied on a phrase in our decision in *Wendinger* and dismissed the trespass claim, but we think the district court read too much into our specific wording in that case. *Wendinger v. Forst Farms, Inc.,* 662 N.W.2d 546 (Minn.App. 2003), *review denied* (Minn. Aug. 5, 2003). We decided in *Wendinger* that "invasive odors" that were emanating onto property from a neighboring confined-pig feeding operation could not be a trespass because the odors were part of transient fumes, which support an action for nuisance but not trespass. We considered but rejected the theory that the fumes were the kind of physical intrusion onto property that could

support a trespass claim, even though, scientifically speaking, odorous elements within fumes are indeed physical substances, which we referred to as merely "particulate matter." *Id.* at 550. We compared the odors in *Wendinger* to the "noxious fumes" that were emanating from a wastewater plant in *Fagerlie v. City of Willmar*, 435 N.W.2d 641, 644 n. 2 (Minn. App.1989). Bad smell, we held, was a nuisance rather than a trespass because, although the essence of the intruding matter was technically a physical substance, it interferes with enjoyment and use of the property but not with its possession. *Id.*

The district court here focused on our use of the term "particulate matter" in our discussing the nature of odors and, relying on the American Heritage Dictionary definition of "particulate matter," it concluded that pesticide drift is particulate matter and therefore not actionable as trespass under Minnesota law. *See id.* (holding that Minnesota law "has not recognized trespass by particulate matter"); *The American Heritage Dictionary of the English Language* 1282 (4th ed.2000) (defining particulate matter as "[m]aterial suspended in the air in the form of minute solid particles or liquid droplets, especially when considered an atmospheric pollutant"). But nothing in our *Wendinger* analysis indicates that we intended the term "particulate matter" to define a unique category of physical substances that can never constitute a trespass. Our holding in *Wendinger*, rejecting the contention that an inactionable odor-based trespass claim is converted into an actionable claim simply because of an odorous fume's nature as a physical substance, is of no controlling force here. Unlike the plaintiffs in *Wendinger*, the Johnsons do not claim trespass based on transient odors. Instead, they primarily complain that the liquid chemicals that the cooperative sprayed into the air from neighboring fields drifted, landed, and remained on the Johnsons' organic crops in detectable form, contaminating them. And while wafting odors will not affect the composition of the land, a liquid chemical pesticide or herbicide being sprayed for agricultural purposes will; by design, it descends and clings to soil or plants, killing organisms.

Although neither *Wendinger* nor other Minnesota cases have directly addressed the issue, the reasoning underlying decisions in similar neighbor-liability cases leads us to conclude that chemical pesticide drift can constitute a trespass. The supreme court has explained that "the intentional throwing of [an object] upon [another's] property would constitute a trespass." *Victor v. Sell*, 301 Minn. 309, 313, 222 N.W.2d 337, 340 (1974). It has also recognized that a landowner owes a general duty "to adjoining or nearby premises" and observed that the duty leads to "liability [being] regularly imposed in cases concerning pesticide spray that drifted and killed bees" on neighboring land. *Anderson*, 693 N.W.2d at 187. We have affirmed as factually supported a negligence judgment against a crop duster after its negligent spraying of herbicides resulted in chemical drift from target fields onto a neighboring field, damaging crops. *Red River Spray Service, Inc. v. Nelson*, 404 N.W.2d 332, 334 (Minn.App. 1987). And we have held that errant bullets shot onto another's property constitutes a trespass. *Citizens for a Safe Grant v. Lone Oak Sportsmen's Club, Inc.*, 624 N.W.2d 796, 805 (Minn.App.2001).

The more specific holdings in chemical-drift trespass cases in other jurisdictions are consistent with our holding today. For example, in *Borland v. Sanders Lead Co., Inc.*, the Alaska Supreme Court recognized that lead particulates and sulfoxide can constitute trespass, reasoning that "if, as a result of the defendant's [smelting]

operation, the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the *Res*, then the plaintiff may seek his remedy in trespass." 369 So.2d 523, 525, 530 (Ala.1979). And similarly, the Washington Supreme Court held in *Bradley v. American Smelting and Refining Co.* that arsenic and cadmium particles emitted from a smelting plant and landing on the plaintiffs' land could also constitute a trespass. 104 Wash.2d 677, 709 P.2d 782, 786–90 (1985).

We recognize that we expressly distinguished *Borland* and *Bradley* in our discussion in *Wendinger* and characterized them as examples of cases in which other jurisdictions, unlike Minnesota, had recognized trespass actions by particulate matter. 662 N.W.2d at 550. Our decision in *Wendinger* rightly rejected the theory that odors alone can constitute trespass in Minnesota, but our citing to *Borland* and *Bradley* was unnecessary to that holding and, as a practical matter, our assessment of them was a bit adrift. Both those cases and this one, unlike *Wendinger*, involved the dispersion of substances that entered into and settled onto land in discernable and allegedly damaging deposits. And both those cases and this one, unlike *Wendinger*, involve a substantive invasion in which the deposited thing—not merely vaporous and dissipating odors—are the source of the injury arising out of the alleged trespass.

In sum, we disagree with the district court that chemical pesticide drift cannot, because of its nature, constitute a trespass. The errant dispersion of pesticides, which contain chemicals designed to affect the land, can interfere with possession. We need not address the cooperative's plausible assertion that incidental and negligible overspray during agricultural application is inevitable, and therefore not actionable. We address only the allegations here, which go beyond inconsequential overspray or odor-related intrusion. We hold that a trespass action can arise from a chemical pesticide being deposited in discernable and consequential amounts onto one agricultural property as the result of errant overspray during application directed at another. The district court therefore erred by concluding that the Johnsons' trespass claim fails as a matter of law.

## II

■ We next address the district court's conclusion that the Johnsons failed to allege damages, an essential element of their nuisance and negligence-per-se claims. *See* Minn.Stat. § 561.01 (2010) (stating that a nuisance action "may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance"); *Anderson,* 693 N.W.2d at 189–91 (requiring damages for a negligence-per-se action). To defeat a summary judgment motion, the opposing party must make a showing sufficient to establish each essential element. *DLH, Inc. v. Russ,* 566 N.W.2d 60, 71 (Minn.1997). This showing is made if it includes evidence that would allow a reasonable factfinder to conclude that the element has been proven. *Schroeder v. St. Louis Cnty.,* 708 N.W.2d 497, 507 (Minn.2006).

The district court concluded that the Johnsons failed to present prima facie evidence of damages caused by the pesticide drift. It reasoned, "[A]s there is no evidence that chemical residue tests performed on the plants ... exceeded the 5% tolerance limits established [under the federal organic-certification regulations], produce from these plants could have been sold as 'organic.'" We review the district court's interpretation of the organic-certifi-

cation regulation de novo. *See Weston v. McWilliams & Assocs., Inc.,* 716 N.W.2d 634, 638 (Minn.2006).

The district court inferred too much from the regulation. The regulation, as part of the organic-certification regulation scheme of the National Organic Program (NOP), limits the circumstances in which farmers may label and sell produce as "organic." Only produce that meets strict NOP standards may be certified as organic. 7 C.F.R. §§ 205.100, .102, .300 (2011); *see also* Minn.Stat. § 31.925 (2010) (adopting the federal Organic Foods Production Act of 1990, 7 U.S.C. §§ 6501–6523, and the associated federal regulations in NOP, 7 C.F.R. § 205, as the "organic food production law" of Minnesota). The regulations require farmers to develop detailed production and handling practices that prevent the commingling of organic and nonorganic foods. 7 C.F.R. § 205.201; *see also* § 205.272 (requiring the farmer to "implement measures necessary to prevent the commingling of organic and nonorganic products and protect organic products from contact with prohibited substances").

The operative regulation here requires that "[a]ny field or farm parcel from which harvested crops are intended to be sold, labeled, or represented as 'organic' must ... [h]ave had *no* prohibited substances ... applied to it for a period of 3 years immediately preceding harvest of the crop." § 205.202(b) (emphasis added). This regulation is at the heart of the Johnsons' claim for damages; they argue that the pesticides were prohibited substances that were "applied to" their field during the cooperative's overspraying, preventing them from selling their crops on the organic market.

The argument is persuasive. The cooperative's counter position, which is that "applied to" does not include unintended residual drift from overspray, is belied by the express language of the regulation. The phrase "applied to" is not defined in the regulations, but we hold that it implicitly includes unintentional pesticide drift. The regulations refer to the "unintended *application* of a prohibited substance," § 205.202(c) (emphasis added), and they also refer to the "*[a]pplication, including drift,* of a prohibited substance," § 205.400(f)(1) (emphasis added). Reading each provision of the regulation as an integrated whole, we therefore deduce that the phrase "applied to" refers to "applications" and that "applications" include even each "unintended application" and that the "application" of a prohibited substance includes "drift" onto a nontargeted field. We hold that the phrase "applied to" in section 205.202(b) includes drift as an unintentional application of pesticide.

The cooperative points to section 205.671 to urge a different holding. That section states only that if "residue testing detects prohibited substances at levels that are *greater than 5 percent* of the Environmental Protection Agency's tolerance for the specific residue detected or unavoidable residual environmental contamination, the agricultural product *must not* be sold, labeled, or represented as organically produced." (Emphasis added). The regulation says nothing about what should happen if the residue testing shows less than five-percent contamination. But the cooperative assumes, and the district court concluded, that it is automatically cleared for sale as organic. We recognize that the assumption has some support from the following general commentary on the regulation:

> The presence of a detectable residue of a product of excluded methods alone does not necessarily constitute a violation of this regulation. As long as an organic operation has not used excluded methods and takes reasonable steps to

avoid contact with the products of excluded methods as detailed in their approved organic system plan, the unintentional presence of the products of excluded methods should not affect the status of an organic product or operation.

National Organic Program, 65 Fed.Reg. 80,548, 80,556 (Dec. 21, 2000) (codified at 7 C.F.R. 205). But interpreting the regulation to allow for an automatic under-five-percent safe harbor for drift ignores this additional, more specific commentary:

> The '5 percent of EPA tolerance' standard is considered a level above which an agricultural product cannot be sold as organic, regardless of how the product may have come into contact with a potential prohibited substance. This standard has been established to: (1) satisfy consumer expectations that organic agricultural products will contain minimal chemical residues and (2) respond to the organic industry's request to implement a standard comparable to current industry practices. *However, the '5 percent of EPA tolerance' standard cannot be used to automatically qualify agricultural products as organically produced, even if the level of chemical residues detected on an agricultural product is below 5 percent of the EPA tolerance for the respective prohibited substance.*

*Id.* at 80, 629 (emphasis added).

We do not speculate as to the Johnsons' damages, but we hold that the district court erroneously rejected their claims for lack of damages on the ground that, by virtue of there having been no finding of five-percent contamination, no damages could be proven. Because the regulations and commentary fail to expressly state what happens if drift causes a less-than-five-percent contamination to an organic farm, we assume that the certifying agent has the discretion to decertify or not decertify the field. *See* 7 C.F.R. § 205.662(a), (c) (providing that if an investigation by a certifying agent "reveals *any* noncompliance" with NOP regulations, a written notice of noncompliance shall be sent to the certified operation, and that this notice can lead to revocation or suspension of certification (emphasis added)).

We add that the Johnsons alleged other damages not considered by the district court. They alleged that the drift has caused "substantial inconveniences" because they are required to report the contamination and it affects their crop rotations, organic-farm planning, and record keeping. They asserted separately that some of the chemicals, presumably fertilizers, enhanced weed growth. They asserted that they had to remove some fields from production. And they alleged that the overspray forced them to destroy some of their crops. Because these identify at least potential bases to recover damages, *see Highview N. Apartments v. Cnty. of Ramsey,* 323 N.W.2d 65, 73 n. 6 (Minn. 1982) (permitting recovery for items lost in flooding, replacement of items, and the "owner's time in coping with the water problems" caused by nuisance), the district court erred by granting summary judgment without addressing them.

Because the district court erred by finding no damages were shown by the Johnsons, we reverse the dismissal of the Johnsons' nuisance and negligence-per-se claims.

### III

■ We turn to the district court's denial of the Johnsons' motion to amend their complaint to add claims arising out of the 2008 drift. We review the district court's denial of a party's motion to amend a complaint for abuse of discretion. *Rosenberg v. Heritage Renovations, LLC,* 685 N.W.2d 320, 332 (Minn.2004). A party

may amend a responsive pleading that has been served if that party has leave of the court, and leave "shall be freely given when justice so requires." Minn. R. Civ. P. 15.01. A district court should permit amendments unless it finds that ·the adverse party would be prejudiced. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). But the district court should deny a motion to amend a complaint when the proposed claim could not survive a summary-judgment motion. *Rosenberg,* 685 N.W.2d at 332.

Here, the district court concluded that the Johnsons' amendments adding the 2008 claims would not withstand summary judgment for the same reasons that the 2007 claims for trespass, negligence per se, and nuisance failed. Because the district court erroneously concluded that the Johnsons' 2007 claims cannot withstand summary judgment, the district court erred by refusing to allow the Johnsons to amend their complaint to add the claims related to the 2008 overspray.

### IV

■■■ We last address the district court's denial of the Johnsons' permanent injunction request. We review the district court's decision whether to grant an injunction for abuse of discretion. *Highview,* 323 N.W.2d at 73. And we rely on the district court's findings unless they are clearly erroneous. *Haley v. Forcelle,* 669 N.W.2d 48, 55 (Minn.App.2003), *review denied* (Minn. Nov. 25, 2003).

The Johnsons sought an injunction under the nuisance statute, Minnesota Statutes section 561.01. This statute has been held to require "harm" to the plaintiff and "wrongful conduct" by the defendant. *Highview,* 323 N.W.2d at 70.

The district court initially issued a temporary injunction, but after dismissing the Johnsons' claims on the merits, it vacated that injunction and denied the Johnsons' request for a permanent injunction. In doing so, it found that there was no harm to the Johnsons and no "wrongful conduct" by the cooperative. These findings were based exclusively on the predicate findings that the Johnsons failed to allege damages. Because those rest on erroneous conclusions of law, the district court's reason for denying the injunction fails. We therefore reverse the denial without prejudice for further consideration of the injunction on remand, offering no opinion about the merit of any other arguments for or against its issuance.

### DECISION

We reverse the district court's summary judgment order dismissing the Johnsons' trespass claim because pesticide drifting onto the Johnsons' farm may have constituted a trespass. We reverse the dismissal of their nuisance and negligence-per-se claims because the dismissal resulted from a misreading of the five-percent-contaminant regulation and the consequently erroneous holding that the Johnsons failed as a matter of law to show any damages. And we reverse the denial of the Johnsons' motion to amend their complaint and of their request for a permanent injunction because both denials were based on the same mistaken legal conclusions. We remand for further proceedings arising from the reversal.

**Reversed and remanded.**