## BENSON COOPERATIVE CREAMERY ASSOCIATION v. FIRST DISTRICT ASSOCIATION AND OTHERS.

151 N. W. (2d) 422.

May 19, 1967—No. 40,344.

*Barnard, Hilleren & Spates, Richard H. Hilleren, Hall, Frazier & Crokin,* and *William D. Hall,* for appellant.

*Doherty, Rumble & Butler, Harold Jordan,* and *George H. Neperud,* for respondents.

*Erickson, Popham, Haik & Schnobrich* and *Rolfe A. Worden,* for Earl J. Meyer, trustee in bankruptcy of Albion-French Lake Cooperative Creamery Assn., amicus curiae.

KNUTSON, CHIEF JUSTICE.

This case involves an appeal from an order of the trial court reinstating plaintiff as a member of defendant association and dismissing its action for damages resulting from an alleged illegal expulsion.

Plaintiff, Benson Cooperative Creamery Association, hereinafter known as Benson, is a cooperative organized and operating under Minn. St. 308.05 to 308.18. Its members consist of individual farmers. Defendant First District Association is likewise a cooperative organized under the laws of Minnesota, but it is owned entirely by other cooperative associations. It will hereinafter be referred to as the Association. Both cooperatives are members of Land O' Lakes Creameries, Inc., which operates as a marketing agency for its members.

Essentially the operations are that individual dairy farmers bring their whole milk to Benson. It skims the butterfat off and manufactures it into butter, which is then marketed through the Land O' Lakes organization. The skim milk is hauled to the Association in its trucks and dried, and the dried milk again marketed through the Land O' Lakes organization. Each member of the Association has a share of common voting stock, having a nominal par value of $5. The Association, in order to qualify under the Federal tax exemption laws, must deal with members and nonmembers alike, and about half of its patrons are nonmembers. The cooperatives operate on a pooling basis; i. e., the product is pooled and the best price possible obtained for it. Advance payment is made monthly to the members or patrons and at the end of the year a surplus is usually accumulated, which is distributed among its patrons either in the form of cash or in the form of certificates of interest which are later redeemed by the cooperative on a basis where the oldest outstanding certificates are redeemed first. Enough of the money is withheld by the cooperative to pay operating expenses and other development expenses.

The individual defendants are the directors and officers of the Association and the president of Land O' Lakes.

Plaintiff became a member of the Association in 1954. It is alleged that an oral agreement was entered into between the Association and its members under which the following terms were agreed upon:

(1) The Association was to pick up in its own trucks all of Benson's skim milk while the latter was a member of the Association.

(2) The Association was to have the exclusive right to determine quantity, quality, grade, and weight of Benson's skim milk.

(3) The price which Benson was to receive for its milk was to be based on the following formula:

(a) Land O' Lakes would make a pool settlement each month for powdered milk it received from the Association and its other members for the previous month's deliveries. The price was to be based on the support price of the United States Government.

(b) The Association was to withhold 4½ cents per pound of milk solids from the monthly settlement it received from Land O' Lakes, the rest to be distributed among its members on a pro-rata basis. This distribution was known and referred to as the "cash monthly advance price."

(c) At the end of each year the Association was to determine how much of the 4½ cents withheld was used in operating the plant; the entire balance was to be distributed among member creameries on a pro-rata basis by way of a cash dividend, or in recalling outstanding certificates of interest, or issuing new certificates of interest, or any combination thereof. The directors were to decide how much of the net profits were to be taken from the Association and paid in cash, whether by way of dividends or in redeeming outstanding certificates of interest. The balance which the directors decided not to distribute in cash was to be accounted for by issuing new noninterest-bearing certificates, which were usually recalled in about 10 years.

(d) Certificates of interest were to be redeemed in the order of their issuance; i. e., the oldest outstanding certificates were to be redeemed first.

(e) Benson's membership was to include one share of voting stock, which carried all the rights, privileges, and appurtenances of other members.

Benson sold about 90,000 pounds of skim milk per day to the Association, constituting a cash monthly advance of about $700 per day.

The National Farmers Organization, Inc., hereinafter referred to as NFO, has its headquarters in Iowa. It is organized on an entirely different basis than a cooperative. Its purpose is to seek a higher price for farm products, but on a guaranteed fixed-price basis rather than on

a pooling arrangement. It seeks to procure individual members and also to procure creameries such as Benson to sign what is known as a master contract, probably for the purpose of inducing individual members to deal with the creamery that had signed a master contract and thereby enhance its own membership.

On February 1, 1963, Benson signed a master contract with NFO. On February 20, 1963, the directors of the Association met and, after discussing the reported difficulties encountered by its member creameries with NFO, passed a resolution instructing its management to contact any of its members who had signed an NFO contract and make every effort to get such contracts terminated, as they deemed membership in NFO inimical to the purposes of the cooperative. Pursuant to this resolution, the manager of the Association met with some of Benson's directors on February 27, 1963, to try to iron out the difficulties existing between them. Shortly thereafter Benson was informed by letter that in consequence of its refusal to void its contract with NFO, the Association would discontinue picking up Benson's milk as of March 7, 1963. At the request of Benson this time was extended to March 27, 1963, so as to permit Benson to submit the matter to its stockholders. Its stockholders voted to retain its affiliation with NFO, and as a consequence the Association discontinued picking up Benson's milk on March 27, 1963. On June 14, 1963, the board of directors of the Association voted to ask for the surrender of Benson's share of stock. The stock was not surrendered and in accordance with its bylaws the Association canceled it on its books and sent Benson a check covering the price of it. It had been a long-established custom and practice of the Association to forfeit the voting stock of any member who for any reason decided to have its milk delivered elsewhere.

This action was brought by Benson, seeking (1) to compel its reinstatement in the Association and recover damages for wrongful expulsion; (2) damages from March 27, 1963, to June 14, 1963, by reason of the Association's failure to pick up Benson's milk; (3) punitive damages and attorneys' fees and costs.

Both parties moved for summary judgment upon the pleadings and

supporting affidavits. The court denied the Association's motion for summary judgment and granted Benson's motion for summary judgment in so far as the action requested reinstatement as a member of the Association. It dismissed the action for damages, but upon reconsideration held that Benson was entitled to recover attorneys' fees in so far as the action involved its reinstatement as a member of the Association. An appeal was taken by Benson from the dismissal of its action for damages and from failure to allow attorneys' fees for all of the action. A review was sought by defendants of the court's order allowing attorneys' fees for any part of the action.

The court in one memorandum seems to hold that the Association had no right to expel Benson for signing a contract with NFO and that Benson therefore was entitled to reinstatement. However, it did indicate that in its opinion the agreement between the Association and Benson could be terminated at any time without cause. We find the following in another of the court's memoranda:

"* * * *The agreement was not for any particular length of time. Under those circumstances the agreement could be terminated by either party without cause. In this case there was no unconditional termination.* The defendant association was willing to continue to pick up and buy the skim milk from the plaintiff's plant if the plaintiff would terminate its contract with NFO. This attitude of the defendant association rules out any basis for the claim that the association acted with intent to injure the plaintiff or that its actions were part of a scheme to force plaintiff into bankruptcy. The defendant association determined that a member having signed an NFO contract pledged his loyalty to that organization rather than the defendant association and that such a situation was untenable. *Whether or not this determination was well founded is not material to the issue of damages in this case.* The determination by this Court that the NFO contract did not justify cancellation of plaintiff's stock has nothing to do with the determination of a policy by the defendant association that the NFO contract was inimicable to the defendants' interests. *There is nothing to suggest that the defendant association could not make termination of an NFO contract with any*

*of its members as a condition to its further business relations with its members."* (Italics supplied.)

If the court was right in holding that the Association was under no obligation to continue to pick up the milk of Benson, then its determination that there was no cause of action for damages would be correct.

■ The general rule is that a contract having no definite duration, expressed or which may be implied, is terminable by either party at will upon reasonable notice to the other. See, 17 Am. Jur. (2d) Contracts, § 486. That is the rule the trial court applied in dismissing Benson's action for damages. The difficulty here is that pretrial depositions upon which the dismissal is based, if considered as evidence, may permit an inference of an agreement to the contrary. F. F. Phillips, who was the general manager of the Association, in his deposition testified:

"Q. Another term of this agreement was that the First District Association would pick that skimmed milk up at Benson, at the creamery located at Benson?

"A. Right.

"Q. And another term of this agreement was that the Benson Cooperative Creamery would refrain from acquiring their own equipment truckwise in bringing this milk to the First District Association at Litchfield?

"A. The First District Association stipulates in contacting any creamery of their becoming a member of our Association, we always stipulate that we shall do the hauling of the product."

Clifford Dahlman, chairman of the board of directors, in his deposition said:

"Q. * * * What I am trying to get at, Mr. Dahlman, do you feel that the agreement, whatever you want to call it, that you with the Benson Cooperative was such that you at any time could terminate it with or without a reason?

"A. No, not as long as they were bringing in a quality product to our plant and as long as they were qualified as members of our plant, I do not think we could.

"Q. It's your understanding that you had to have a reason then

before you could terminate this relationship with the Benson Cooperative Creamery?

"A.   That's right."

In the deposition of Dan C. Holtz, a director, we find the following:

"Q. Now there have been a lot of questions asked of you about the arrangement between First District and its members about picking up milk of the members. I would like to have you tell me again, just to make it clear, is it not true that First District's understanding is when it takes in a member that it will pick up that member's milk as long as the member wants it picked up and as long as the member is abiding by the purposes of the cooperative and purposes of the Articles and bylaws of the cooperative?

"A. This is right.

"Q. That is the general understanding?

"A. That is the general understanding, yes."

In the deposition of Carl Isaacson, a director, we find the following:

"Q. And it was the intent of the First District and the Board of Directors that the Benson Cooperative Creamery send all its milk down to the First District?

"A. Well, according to — that's with all the creameries. They sent all their milk in.

"Q. That was one of the terms of the Benson Creamery becoming a member? Isn't that right?

"A. That's right.

"Q. And it was the intention of the First District to continue to take their milk until there was some violation of the Articles or bylaws by the Benson Cooperative Creamery, is that true?

"A. That's true.

\*   \*   \*   \*   \*

"Q. But was it your understanding without having a good reason that you couldn't refuse to pick up the milk?

"A. That's right.

"Q. You are saying that you felt that you had a good reason?

"A. That's right.

"Q. But you agree that without a good reason the arrangement between the Benson Cooperative Creamery and the First District was such that you couldn't refuse to pick it up, you had to have a reason, right?

"A. That's right."

■ Thus it follows that there is a crucial issue of fact that must be determined by trial. If the evidence as finally adduced leads to a sustainable determination that this contract was terminable at the will of the Association upon reasonable notice without cause, there would be no cause of action for damages, at least not for failure to pick up Benson's milk after March 27, 1963. On the other hand, if the evidence sustains a binding agreement that the Association would continue to pick up Benson's milk, of the required quality, so long as it remained a member of the Association, then Benson would be entitled to recover its damages, whatever they might be, for breach of that contract. That issue should not have been determined by summary judgment on the state of this record. While the depositions are not necessarily conclusive on a trial, they do prevent disposition of this issue without a trial.

On the right to recover damages for wrongful expulsion, too, there may be an issue of fact. While we have no authority involving expulsion from a cooperative, it seems to be a general rule that a member of an association ordinarily may recover damages for wrongful expulsion if there are any damages. Malmsted v. Minneapolis Aerie No. 34, 111 Minn. 119, 126 N. W. 486; Burmaster v. Alwin, 138 Minn. 383, 165 N. W. 135. Apparently the same rule would apply to a cooperative. See, Packel, The Law of Cooperatives (2 ed.) p. 170.

■ We are inclined to agree with the trial court that on the record before us it is doubtful that Benson can establish more than nominal damages for the expulsion, but it still has the right to present evidence for whatever it is worth.

The trial court held there were no grounds for punitive damages. With that we agree. To justify an award for punitive damages, the wrongful act must have been done with malicious motive.[1] Such damages are intended as punishment for a willfully wrongful act, done with

---

[1] Our authorities are collected in 5B Dunnell, Dig. (3 ed.) § 2540.

malice. Kirschbaum v. Lowrey, 165 Minn. 233, 206 N. W. 171. By virtue of the order of the court reinstating Benson to membership in the Association, from which no appeal has been taken, we must assume the action of the Association was unlawful. But that is not enough to establish a right to punitive damages. The pretrial depositions establish conclusively that the Association acted in good faith, believing it had a right to expel Benson for joining NFO. Punitive damages are an exception to the rule of compensatory damages, which are based on the theory that the injured party is entitled to recover in money damages what he has lost in order to compensate him for such loss. In McCormick, Damages, § 77, et seq., the subject of punitive damages is exhaustively explored.[2] In § 79 we find:

"To subject a wrongdoer to liability for exemplary damages, it must be found that he acted with actual malice, ill will, or conscious disregard of consequences to others. Almost universally the decisions hold that mere 'implied malice,' which is attributed to any actionable conduct, does not suffice, nor does mere negligence."

Inasmuch as the Association acted in good faith in a mistaken belief that it had the right to expel Benson for joining NFO, there is no ground for assessing punitive damages.

It is clear that the Association could have provided in its bylaws that membership could be canceled if its members joined NFO. As a matter of fact, the Association amended its bylaws on December 8, 1965, to so provide, and thereafter Benson's membership in the Association was legally terminated. The only difficulty that the trial court found was that the bylaws as they stood at the time when Benson was expelled in 1963 did not permit such expulsion for joining NFO. At the best it was a technical difficulty that was later resolved.

It is somewhat difficult to reconcile the court's determination that Benson was wrongfully expelled with its apparent holding that the agreement to pick up milk was terminable at will, but it may be that

---

[2] See, also, Morris, *Punitive Damages in Tort Cases*, 44 Harv. L. Rev. 1173.

the evidence will establish that, as to a member, the Association could refuse to pick up its milk. That remains to be resolved by trial.

■ The trial court upon reconsideration on Benson's motion concluded that Benson was entitled to recover attorneys' fees in so far as the action involved reinstatement as a member. The court relied upon Bosch v. Meeker Co-op. Light & Power Assn. 257 Minn. 362, 101 N. W. (2d) 423. That case was a derivative suit by a stockholder resulting in a determination that a purported election of directors and a proposed amendment to the corporate bylaws were invalid. While there is some language in our opinion which, if taken out of context, seems to support plaintiff, a careful reading of the opinion as a whole simply affirms the rule we have followed that a derivative suit by a stockholder which "results in a substantial benefit to the corporation" permits an award of attorneys' fees.

Ordinarily, attorneys' fees are not recoverable in litigation unless there is a specific contract permitting it, or a statute authorizing such recovery. Dworsky v. Vermes Credit Jewelry, Inc. 244 Minn. 62, 69 N. W. (2d) 118; 22 Am. Jur. (2d) Damages, § 165.

There are some exceptions to this rule. In the field of actions involving corporations, and we assume the same rule applies to cooperatives, there are essentially two exceptions. In a derivative action brought by a stockholder which results in a substantial benefit to the corporation, which is exemplified by Bosch v. Meeker Co-op. Light & Power Assn. *supra*, such attorneys' fees have been allowed. On the other hand, where a director is sued in a derivative suit by a stockholder, and he is vindicated, we have held that he is entitled to recover attorneys' fees from the corporation. In re Dissolution of E. C. Warner Co. 232 Minn. 207, 45 N. W. (2d) 388.

The authorities are collected in these cases and need not be further reviewed here. This case does not fall within the realm of either of these exceptions. We are asked here to add a third exception, namely, that a suit brought by a stockholder for its own benefit, resulting in a favorable termination of all or part of the suit, will justify the award of attorneys' fees against the corporation. The action before us was not brought for the benefit of the Association, nor could it conceivably

result in any such benefit. All parts of the action were intended for the sole benefit of Benson. Under these circumstances we do not believe we should extend the right to recover attorneys' fees to this type of action. All the court's decision did was to determine that the bylaws, as they then existed, did not permit expulsion on the grounds that a member had joined the NFO. While it is true that we now hold the court was in error in dismissing the action for damages, we think the court was clearly right in determining that no attorneys' fees should be allowed in that part of the action.

Affirmed in part and reversed in part.

On July 7, 1967, the following opinion was filed:

PER CURIAM.

Appeal from clerk's taxation of costs.

In this case plaintiff was appellant and defendants respondents. Defendants interposed a cross-appeal. Plaintiff prevailed on one issue and defendants prevailed on other issues. Plaintiff has taxed costs in the sum of $1,583.99 and defendants have taxed costs in the sum of $259 on their cross-appeal. Much of plaintiff's costs relates to the printing of the record, a large part of which involved the issues on which defendants prevailed. The costs should be apportioned between them. The total costs taxed by plaintiff and defendants together amount to the sum of $1,842.99. One-half thereof is $921.50. Deducting costs taxed by defendants leaves a balance of $662.50.

IT IS THEREFORE ORDERED that plaintiff be allowed costs and disbursements in the sum of $921.50 from which there shall be deducted the sum of defendants' costs amounting to $259, leaving a balance in favor of plaintiff of $662.50.