# BENSON COOPERATIVE CREAMERY ASSOCIATION
# v. FIRST DISTRICT ASSOCIATION AND OTHERS.

170 N. W. (2d) 425.

August 15, 1969—No. 41516.

*Barnard, Hilleren & Spates, Richard H. Hilleren, Hall & Pace,* and *William D. Hall,* for appellant.

*Harold Jordan, Ralph K. Morris,* and *George Neperud,* for respondents.

SHERAN, JUSTICE.

Appeal from a judgment of the district court and from an order denying a motion for amended findings or, in the alternative, for a new trial.

The background of the litigation giving rise to this appeal is set out in Benson Co-op. Creamery Assn. v. First District Assn. 276 Minn. 520, 151 N. W. (2d) 422, 152 N. W. (2d) 182. In that decision we reversed an order of the district court made upon motions of both parties for summary judgment and held that

the question of whether First District Association was obligated to accept skim milk tendered to it by Benson Cooperative Creamery Association while a cooperative member in good standing could not be determined upon the pleadings and affidavits.

## TRIAL COURT'S DECISION

Upon remand evidence pertinent to this issue was submitted, and the trial court made findings of fact which we now summarize: The Benson Cooperative Creamery Association, plaintiff, is a cooperative subject to Minn. St. 308.05 to 308.18. Its members are producers of dairy products living in the Benson, Minnesota, area.

Defendant, First District Association, located at Litchfield, Minnesota, is also a cooperative association governed by §§ 308.05 to 308.18. Its membership includes cooperative creameries in the Litchfield area. First District Association obtains skim milk from creameries such as Benson; processes the skim milk in its drying plant to produce dried milk; and markets the dried milk through Land O' Lakes Creameries, Inc.

Member stockholders of First District Association receive advance payments from it upon delivery of their skim milk. At the end of the year, any surplus that has accumulated over and above First District's operating costs and reserves is distributed either in cash or in the form of certificates of interest redeemable in the order issued. First District also obtains skim milk from patrons who are not members. To meet requirements specified by Federal tax-exemption law, nonmember patrons are treated in the same way as stockholding members of the cooperative in so far as marketing and payment arrangements are concerned.

Since June 1954, Benson has had all of its skim milk processed through First District. The articles and bylaws of First District do not specifically require that the member stockholders market their products through defendant exclusively. Although First District began picking up Benson's skim milk at the Benson plant in 1954, there was no express agreement between Benson and First District pertaining to the duration of the arrangement

other than defendant's reserving the exclusive right to determine the quantity, quality, grade, and weight of the skim milk supplied to it. During the period that Benson was continually supplying its milk to First District, approximately 16 private patrons and member stockholders discontinued supplying skim milk to defendant; of these, some resumed supplying their product to First District and some did not. In situations where a member stockholder ceased to supply its product for a considerable length of time, defendant's general practice was to terminate the supplier's membership.

On February 1, 1963, Benson signed a contract submitted to it by the National Farmers Organization (NFO), termed a "Master Processor's Contract," by the terms of which Benson would pay NFO member producers a guaranteed price per hundredweight for whole milk. In exchange, the NFO (if and when the contract became effective) agreed to supply Benson fixed quantities of whole milk from NFO members. This master contract did not control the marketing of skim milk by Benson. The "Master Processor's Contract" was not to be effective until a certain percentage of processors such as Benson in a 10-state area had signed it—an event which did not occur. However, because of the developments between Benson and the NFO, other cooperative creameries, also members of First District, who refused to negotiate with the NFO concluded that Benson's willingness to execute the master processor's contract interfered with their customary sources of supply. This gave rise to complaints which prompted First District to adopt a resolution on February 20, 1963, to the effect that a First District member who executed a NFO contract was disloyal to First District. Plaintiff Benson was given until March 27, 1963, to rescind its signature to the master processor's contract. It did not do so. First District then refused to pick up Benson's skim milk.

Upon these findings, the trial court concluded that, although First District's refusal to pick up plaintiff's skim milk was without cause, the arrangement was terminable at the will of de-

fendant without cause upon reasonable notice and that the notice of termination given to plaintiff was reasonable. In accord with these findings and conclusions, judgment was ordered dismissing plaintiff's cause of action for general damages based on breach of contract.

### DECISION ON APPEAL

It is important to note that there was no provision in First District's articles or bylaws forbidding members from entering into contracts with the NFO of the type here involved until December 8, 1965.[1]

There is nothing in our statutes or in the articles and bylaws of First District imposing an obligation on it to accept the skim milk tendered by its member patrons. No express agreement on this subject was made. However, we believe the evidence considered as a whole implies that in the absence of express agreement First District was under a continuing duty to accept the skim milk tendered by Benson so long as Benson continued to be a member in good standing of the processing cooperative and that the failure of First District to fulfill this obligation without reasonable cause constituted breach of implied contract between First District and Benson for which such general damages, if any, as are provable can be recovered.

The reasons in combination which we feel compel this conclusion are these:

(a)   The essence of membership in First District from the

---

[1]In Benson Co-op. Creamery Assn. v. First District Assn. 276 Minn. 520, 529, 151 N. W. (2d) 422, 428, we said: "It is clear that the Association could have provided in its bylaws that membership could be canceled if its members joined NFO. As a matter of fact, the Association amended its bylaws on December 8, 1965, to so provide, and thereafter Benson's membership in the Association was legally terminated. The only difficulty that the trial court found was that the bylaws as they stood at the time when Benson was expelled in 1963 did not permit such expulsion for joining NFO. At the best it was a technical difficulty that was later resolved."

standpoint of Benson was the right to have its perishable product marketed through the facilities afforded by the Litchfield cooperative. To be sure, membership in First District gave Benson a right to vote at its annual meetings, an opportunity not afforded to patrons of First District who had not achieved membership status. But it is clear to us that Benson's reason for being a member of First District arose out of its need for an outlet for its skim milk rather than because of any desire to influence First District policies by casting a single vote at annual membership meetings.

(b) While First District had the right to refuse to accept a member's milk if it had reasonable cause for doing so, an uncontested finding of the trial court establishes the absence of such cause in this case.

(c) The fact that on occasion some members of the cooperative delivered skim milk to producers other than First District does not negative the existence of First District's implied duty. It is a unique feature of membership in associations that the right of a member to withdraw at any time does not of itself give to the association a comparable right to terminate the membership agreement. It must first be demonstrated that the member has violated a rule or policy of the association adopted by its members and that the rule or policy is not in violation of the law or so unfair as to be contrary to public policy.[2]

(d) While the opinion of an officer of First District as to the legal implications of membership in the association cannot be considered binding, the following testimony by Clifford Dahlman, chairman of the board of directors of defendant, is at least indicative that our interpretation of the implied obligation of First District is in accord with his understanding:

"Q. In other words a person has to be delivering milk in order to be a member?

_____

[2]See, Peters v. Minn. Dept. of Ladies of G. A. R. 239 Minn. 133, 58 N.W. (2d) 58; 6 Am. Jur. (2d) Associations and Clubs, §§ 26, 33.

"A. Yes.

"Q. And you won't give somebody a share of stock unless he is delivering products?

"A. That's right, not if he wasn't.

"Q. And when he would stop delivering a product, then you would cancel his share?

"A. Not necessarily immediately but in the future we would.

"Q. Because it is the delivering of a product which is essential to membership?

"A. That's right."

(e) As of the time that First District refused to accept Benson's skim milk, Benson had approximately $90,000 in equity credits (certificates of interest) in the processing cooperative. Equity credits are "in effect the capital of the cooperative." 18 Am. Jur. (2d) Cooperative Associations, § 15, and cases cited in note 2. Since Benson has in effect contributed to the capital fund which made it possible for First District to carry on its business operations, it seems unreasonable that Benson should be deprived of an outlet for its product without reasonable cause or justification.

(f) A cooperative association is not entitled to discriminate unreasonably between members in good standing.[3] At the time here involved, Benson was a member in good standing of the cooperative, it having been determined that its expulsion for refusal to rescind its marketing arrangement with the NFO prior to the amendment of the bylaws authorizing expulsion on this ground was unjustified. To permit the cooperative to refuse to accept the skim milk of one member while accepting it from others without justifiable reason or good cause, in the absence of advance understanding between the parties, would be to countenance a form of discrimination which we believe to be in-

---

[3]See, Bertram v. Danish Creamery Assn. 120 Cal. App. (2d) 458, 261 P. (2d) 349; 18 Am. Jur. (2d) Cooperative Associations, § 19.

consistent with the relationship between a cooperative association and its membership.

In arriving at our decision and in setting out the reasons for it, we are conscious of the fact that nonmember patrons also accumulated equity credits in First District and that it can be said of such nonmember patrons that they, too, contributed to the capital structure of the cooperative. We recognize also that patrons of a cooperative such as First District who are not members could also come to depend on First District as an outlet for their skim milk. These facts are less significant than they would otherwise be because the treatment accorded patrons as distinguished from members was the result of First District's desire to comply with advantageous income tax provisions. Benson's right to the services of the association, on the other hand, rests principally on the facts that it was a member in good standing and the essence of its membership was the right to market its skim milk through the association; the refusal of the cooperative to accord Benson this right in the absence of governing statute, pertinent cooperative article or bylaw, or express understanding would be, in our judgment, inconsistent with the nature of the arrangement.

The judgment appealed from is reversed and the case is remanded to the district court for further proceedings consistent with this opinion.