# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3607

_____

| | | |
|---|---|---|
| Minnesota Deli Provisions, Inc., | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Boar's Head Provisions Co., Inc., | * | |
| and Frank Brunckhorst Co., LLC, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: June 11, 2009
Filed: May 27, 2010

_____

Before LOKEN,[1] Chief Judge, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

This case for damages, arising out of the termination of a business relationship, involves charges of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and tortious interference with business

_____

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

relations. The district court[2] entered summary judgment for the defendants, Boar's Head Provisions Co., Inc. ("Boar's Head") and Frank Brunckhorst Co., LLC ("Brunckhorst"). We affirm.

I.

Boar's Head is a producer of premium delicatessen products that are sold in delicatessens and select supermarket chains throughout the United States. Brunckhorst is the national distributor of Boar's Head products and sells to over 300 independent distributors who, in turn, resell the Boar's Head products to the stores. Minnesota Deli Provisions, Inc. ("Minnesota Deli") is a former Boar's Head distributor.[3]

In 1999, John Marso, president and owner of Minnesota Deli, learned of a potential business opportunity to distribute Boar's Head products in Minnesota. After preliminary discussions with Boar's Head, Marso attended a six-week training program that Boar's Head required for its prospective distributors. At a dinner during this training program, Marso alleges that Boar's Head executive Rick Bellucci told Marso that "you'll never be touched" as long as Marso grew his business satisfactorily.

---

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[3] Minnesota Deli's business relationship was at all times with Brunckhorst and not with Boar's Head. Brunckhorst works in close coordination with Boar's Head. Neither party suggests any distinction between the parties. Their relationship to each other is not at issue in this case. The district court referred to appellees collectively as "Boar's Head." We will do the same, except when individual references are needed for clarity.

On March 17, 2000, before becoming a distributor, Marso signed a form acknowledging that he had read Brunckhorst's Sales Policy for Out-of-Town Distributors ("Sales Policy"). That writing includes the following passages:

> As a Boar's Head distributor, you are responsible for ensuring that all Boar's Head products are properly handled and rotated by your employees and your retailers. You must provide proper and continuous training regarding the handling, rotation and display of all products at both the distribution and retail levels . . .. It is the policy of the Company not to do business with any distributor that fails to satisfy our standards for cleanliness . . ., freshness and presentation of product.
> . . .
> The Company reserves the right to make all judgments, in its sole discretion, as to where and by whom its products will be sold.
> . . .
> The Company reserves the right, in all circumstances, to ensure that all areas are being properly developed and to make whatever adjustments to its distribution system it deems necessary to achieve that objective, including the appointment of additional distributors in any geographic area or the implementation of direct sales.

In August 2000, Boar's Head formally appointed Marso's company, Minnesota Deli, as a distributor of Boar's Head products. Marso discussed his appointment with Bellucci over the phone. Marso alleges that during this call, Bellucci indicated that Minnesota Deli would continue to be the distributor as long as it complied with the requirements that Bellucci articulated during the training session. Marso testified that during this conversation, he and Boar's Head reached an oral agreement concerning Minnesota Deli's distributorship.

Minnesota Deli alleges that Boar's Head executive Sherry Robert assured Marso that Boar's Head distributors have the right to sell the accounts they owned. Also, Boar's Head's regional sales manager Brent Lindorfer told him that Boar's Head

-3-

"would never do anything to [him]." During this time period, Minnesota Deli made additional investments of purchasing a warehouse and custom refrigerated trucks.

In August 2005, Scott Williams, a newly appointed regional chain coordinator for Boar's Head, visited several of Minnesota Deli's supermarket accounts. He prepared a summary report addressed to Joe Pizzurro, Boar's Head's national sales manager. The report stated that "the stores are very clean and well taken care [of]." He went on to say, "I found multiple out of code items in multiple stores. . .. I found unopened out of code items that were as old as two weeks." Minnesota Deli alleges that while finding out-of-code items is a problem with other distributors, Boar's Head generally addressed such issues by doing nothing, asking the distributors to participate in product integrity training, or requiring a distributor to sell some accounts.

Later that month, Marso went to New York to meet with Pizzurro and Regional Sales Manager Lindorfer. At the meeting, Pizzurro told Marso that Williams had purportedly found out-of-code products in five of Minnesota Deli's stores. Pizzurro then went on to explain that Boar's Head would be reassigning those five accounts to another distributor without compensation to Minnesota Deli. A couple of weeks after the meeting, Boar's Head sent additional employees to Minnesota Deli's retailers to specifically check for product integrity violations. The employees discovered out-of-code product in five additional stores. Pizzurro then informed Marso that it would be taking these five additional accounts from Minnesota Deli as well.

Meanwhile, Boar's Head placed an advertisement in the Minneapolis Star Tribune seeking distributors. Marso attempted to find a distributor to take over the Minnesota Deli accounts, but Boar's Head reassigned Minnesota Deli's ten stripped accounts without compensating the company.

On March 10, 2006, Minnesota Deli filed a petition in federal district court, alleging that Boar's Head breached an oral agreement. The agreement allegedly

provided that Minnesota Deli would not be terminated as long as it performed adequately. In addition, Minnesota Deli alleges that it would be allowed to sell its customer accounts to other distributors or would otherwise be compensated. In addition to the breach of contract claim, Minnesota Deli alleged claims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, and tortious interference with actual and prospective business relations.

Shortly after Minnesota Deli filed the petition, Boar's Head sent employees to look for further out-of-code product in stores within Minnesota Deli's market. On April 11, 2006, having found more out-of-code product, Pizzurro gave a written notice of termination. The notice stated that Minnesota Deli would no longer be a distributor, effective on June 30, 2006. As a result, all of Minnesota Deli's accounts were ultimately reassigned to another distributor. On September 14, 2006, Minnesota Deli filed an amended complaint claiming additional damages.

Boar's Head moved for summary judgment, and the district court entered summary judgment in its favor on all counts. Minnesota Deli appeals.

II.

We review a district court's grant of summary judgment de novo, applying "the same standards as the district court and viewing the evidence in the light most favorable to the nonmoving party." Travelers Prop. Cas. Co. of Am. v. Gen. Cas. Ins. Co., 465 F.3d 900, 903 (8th Cir. 2006). Summary judgment is appropriate only when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although we view the facts and inferences in the light most favorable to Minnesota Deli, it has the obligation to come forward with specific facts showing that there is a

genuine issue for trial.  See Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A.

Minnesota Deli appeals the district court's grant of summary judgment on its breach of contract claim.  It urges us to reverse the judgment of the district court because it contends that there are legitimate questions of material fact concerning (i) whether the contract is terminable at will and (ii) whether Minnesota Deli had a contractual right to a reasonable opportunity to sell its accounts.  We first turn to Minnesota Deli's argument that there are genuine issues of material fact concerning whether the contract is terminable at will.

Under Minnesota law, "[t]he general rule is that a contract having no definite duration, expressed or which may be implied, is terminable by either party at will upon reasonable notice to the other."  Benson Coop. Creamery Ass'n v. First Dist. Ass'n, 151 N.W.2d 422, 426 (Minn. 1967); see also Elvgren Paint Supply Co. v. Benjamin Moore & Co., 948 F.2d 1082, 1084 (8th Cir. 1991) (affirming summary judgment where distributorship was based on alleged oral agreement of indefinite duration and hence terminable at will by either party upon reasonable notice).  Minnesota law does not, however, permit unilateral termination at will in cases where the contract provides that it will continue "as long as" one party performs satisfactorily.  See, e.g., Benson Coop. Creamery Ass'n, 151 N.W.2d at 427.  Cf. W.K.T. Distrib. Co. v. Sharp Elec. Corp., 746 F.2d 1333, 1335 (8th Cir. 1984) (applying Minnesota law and discussing the difference between contracts terminable at will and contracts that are to continue as long as one party performs).  Minnesota Deli argues that there is a genuine issue of material fact as to whether the contract contains such a durational agreement.

To support this argument, Minnesota Deli points to the assurances of Boar's Head employees, an internal Boar's Head email, and the Boar's Head Suggestions and Guidelines for Route Transfers ("Guidelines") as evidence of a durational agreement between the parties. We consider each in turn.

First, Minnesota Deli argues that Boar's Head executive Bellucci assured Marso that Boar's Head would not terminate Minnesota Deli's distribution of its products. Specifically, Minnesota Deli contends that Bellucci told Marso at a dinner during the training, "you'll never be touched" as long as Minnesota Deli grew its business satisfactorily. Minnesota Deli claims that Bellucci reassured Marso of this during an August 2000 phone call. Minnesota Deli also alleges that regional sales manager Lindorfer told Marso that Boar's Head "would never do anything to [him]." Upon review of the record, we reach the same conclusion as the district court: such assurances contain nothing more than general statements that are too indefinite to create a legally enforceable offer for a durational term. See Degen v. Investors Diversified Servs., Inc., 110 N.W.2d 863, 866 (Minn. 1961) (assurances made that employee's position was a "career position" was insufficient to establish permanent employment contract); see also Cederstrand v. Lutheran Brotherhood, 117 N.W.2d 213, 220 (Minn. 1962) (stating "it is neither practical nor reasonable to expect full performance of every assurance given, whether it be thoughtless, casual and gratuitous, or deliberately and seriously made").

Next, Minnesota Deli points to an internal email between Lindorfer and Pizzurro to show that a genuine issue regarding duration exists. The email explains the response Lindorfer was planning to give to Marso regarding the product integrity violations. It states, "as you are well aware, [Boar's Head] does not regularly stop selling products to its customers except in circumstances that put the integrity of the brand at risk." Minnesota Deli fails to point out, however, that the email also states, "Let me remind you one last time that there are no Boar's Head franchises and our business relationship is an at will relationship, meaning that you may choose to stop

purchasing [Boar's Head] products at anytime [sic] for any reason and that [Boar's Head] may stop selling [Boar's Head] products to you at any time for any reason." Contrary to Minnesota Deli's contention, this document supports Boar's Head's sole discretion in selling its products.

Minnesota Deli also argues that the Guidelines demonstrate that the parties' relationship had a durational term. The Guidelines state that Boar's Head has the right to terminate business relations if a distributor is "not performing satisfactorily." Minnesota Deli, however, takes this quote out of context. As the document makes clear, Boar's Head "does not enter into long-term contractual arrangements with distributors." The Guidelines state that "[t]he right to distribute Boar's Head products is granted by [Brunckhorst], *and only by [Brunckhorst]*, which has the sole discretion for selecting the independent distributors who will be authorized to deliver [B]oar's Head products to retail outlets." We simply cannot conclude that the phrase "not performing satisfactorily," when read in context, creates an enforceable limit on Boar's Head's right to terminate business relations.

That Marso signed a similarly worded Sales Policy supports this conclusion. Boar's Head's written policies state that it reserves the right to (i) "make all judgments, in its sole discretion, as to where and by whom its products will be sold," and (ii) change its distribution network as it deems necessary to ensure that customers and merchants are being properly serviced. These statements only bolster Boar's Head's contention that the contract was at-will. Accordingly, we are convinced that the parties' relationship was terminable at will and did not encompass a durational agreement. Compare Benson Coop. Creamery Ass'n, 151 N.W.2d at 426 (general manager and three directors of alleged breaching party testified that they too believed that the contract at issue was terminable only for good reason).

Next, we turn to Minnesota Deli's argument that it had a contractual right to sell its customer accounts even in cases of termination. Minnesota Deli argues that

Boar's Head was contractually obligated to allow Minnesota Deli to sell its accounts to another distributor under general contract principles. Minnesota Deli does not allege that the right to sell accounts was agreed upon during Marso's August 2000 phone call with Bellucci. Instead, Minnesota Deli contends that Robert assured Marso of this right during a conversation that took place during an unknown time or place. Marso testified that Robert told him that Minnesota Deli could sell its stores under all circumstances. In his earlier deposition testimony, however, Marso testified that there was not a discussion about the sale of accounts in the context of his termination until August 2005, five years after the phone call with Bellucci. Upon review of the testimony, we believe that it contains nothing more than Marso's subjective beliefs about the situation and is insufficient to support a contractual right to sell Minnesota Deli's accounts. See Hill v. Okay Const. Co., Inc., 252 N.W.2d 107, 114 (Minn. 1977) ("The test of contractual formation is an objective one, to be judged by the words and actions of the parties and not by their subjective mental intent.").

In addition to Marso's testimony, Minnesota Deli relies on Boar's Head's dealings with other parties, its distribution of documents intended to help with account transfers, and a Boar's Head newspaper advertisement to establish Minnesota Deli's right to sell its accounts. Minnesota Deli argues that this evidence supports the contention that the parties had an understanding based upon Boar's Head's "course of dealing" with other distributors. The district court concluded that these documents do not go to the specific agreement reached between the parties and that "Boar's Head was free to negotiate different arrangements with different distributors . . .." See Minn. Stat. § 336.1-303(b) (defining course of dealing as "a sequence of conduct concerning previous transactions between the parties to a particular transaction"). Having presented no evidence of an agreement reached between the parties, we simply cannot conclude that Minnesota Deli established a course of dealing between the parties regarding a contractual right to sell its customer accounts.

Our review of the record regarding the breach of contract claim yields the same result as that reached by the district court. Viewing the facts in the light most favorable to Minnesota Deli, Boar's Head is entitled to judgment as a matter of law on the breach of contract claim. Accordingly, we need not address Minnesota Deli's argument that Boar's Head violated the implied covenant of good faith and fair dealing because a cause of action for breach of the implied duty of good faith and fair dealing does not exist independently of a breach of contract claim. See Medtronic, Inc. v. ConvaCare, Inc., 17 F.3d 252, 256 (8th Cir. 1994).

## B.

Minnesota Deli next claims that even if we do not find an enforceable contract, it relied on Boar's Head promises to its detriment. Under Minnesota law, promissory estoppel requires (1) a clear and definite promise; (2) intent to induce reliance; (3) actual reliance; and (4) a need to enforce the promise in order to prevent injustice. Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (Minn. 1995).

We conclude, as did the district court that a "clear and definite" promise cannot be found in the evidence. As discussed, Boar's Head may have given Marso vague assurances, but when viewed in the light most favorable to Minnesota Deli, the facts do not establish that Boar's Head made a clear and definite promise to Minnesota Deli. See Elvgren Paint Supply Co., 948 F.2d at 1084 (promissory estoppel claim dismissed on summary judgment where alleged promises were "too general to support a promissory estoppel claim"). Accordingly, the district court correctly granted summary judgment on Minnesota Deli's promissory estoppel claim.

## C.

Finally, Minnesota Deli argues that the district court erred in granting summary judgment on its claims of tortious interference with contractual and prospective

business relations. "To prevail on the state law claim of tortious interference with contractual relations, [Minnesota Deli] must prove that: (1) a contract existed; (2) the alleged wrongdoer . . . had knowledge of the contract; (3) the alleged wrongdoer intentionally interfered with the contract; (4) the alleged wrongdoer's actions were not justified; and (5) damages were sustained as a result." Guinness Import Co. v. Mark VII Distrib, Inc., 153 F.3d 607, 613 (8th Cir. 1998). Further, "[t]o prevail on a claim of interference with prospective economic relations, [Minnesota Deli] must prove [Boar's Head] intentionally committed a wrongful act that improperly interfered with [Minnesota Deli's] prospective business." Id.

Viewing the facts in the light most favorable to Minnesota Deli, there is no evidence that Boar's Head's actions were unjustified, as is necessary for a claim of tortious interference with contractual relations. See id. Likewise, Boar's Head's actions did not constitute a wrongful act, as is necessary for a claim of tortious interference with prospective relations. See id. Accordingly, the district court did not err in granting summary judgment on the tortious interference claim.

III.

For the foregoing reasons, the judgment of the district court is affirmed.

_____