# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1209
_____

Louis DeGidio, Inc.; Louis DeGidio Services, Inc.

*Plaintiffs - Appellants*

James DeGidio; Michael DeGidio

*Plaintiffs*

v.

Industrial Combustion, LLC, et al.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 15, 2022
Filed: April 24, 2023

_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.

_____

LOKEN, Circuit Judge.

When a manufacturer sells replacement parts to a distributor to repair products the distributor sold, does the manufacturer collect an indirect "franchise fee" within the meaning of the Minnesota Franchise Act, Minn. Stat. § 80C.01, subd. 4, if it

charges the distributor a price based on the retail price the manufacturer paid a third party vendor for the parts? We agree with the district court[1] the answer is clearly no and therefore the distributorship agreement here at issue was not a franchise. We further agree that the manufacturer, Industrial Combustion, LLC ("IC"), did not breach an oral implied-in-fact contract, and was not barred by promissory estoppel, when it terminated the DeGidio sales representative without cause. Applying Minnesota law and reviewing *de novo*, we affirm the grant of summary judgment in favor of IC and its parent company, Cleaver-Brooks, Inc. See HIP, Inc. v. Hormel Foods Corp., 888 F.3d 334, 338 (8th Cir. 2018) (standard of review).

## I. Background

In 1958, Louis DeGidio, the father of plaintiffs James and Michael DeGidio, began purchasing, distributing, and servicing IC burners for institutional boiler systems in a sales area including most of Minnesota. IC's non-exclusive distributors are responsible for installing and servicing the IC burners they sell. In 1996, the family incorporated Louis DeGidio, Inc. ("LDI") and Louis DeGidio Services, Inc. ("LDSI"). LDI continued purchasing burners from IC. LDSI installed and serviced the burners LDI sold, purchasing replacement parts from IC. The two corporations shared the same location, officers, and shareholders. James and Michael were joint 50% shareholders and key officers of both. Whatever written agreement was then in effect is not in the record, but it is undisputed that LDI was the distributor.

Plaintiffs' lengthy Second Amended Complaint ("SAC") alleges that in 2000 IC presented a new written distributorship agreement for the same sales territory. LDI signed the agreement, allegedly relying on "IC's express commitment to continue providing IC products in the future." In 2007, IC presented a new Non-Exclusive

---

[1]The Honorable John R. Tunheim, then Chief Judge of the United States District Court for the District of Minnesota.

Sales Representative Agreement between IC and LDI ("2007 Agreement"). The SAC alleges:

> Both before and after Mike DeGidio signed the 2007 Agreement, IC's Director of Sales and Marketing, John Stupec ("Stupec"), made the express promise that "[LDI and LDSI] would be regarded by IC as the same entity" and that "the signature of Mike DeGidio as President of [LDI] would be regarded by IC as a signature made on behalf of both."

LDSI was not a named party to the 2007 Agreement. Plaintiffs allege that during or at the end of the meeting at which the parties signed the Agreement, James DeGidio noted that LDSI was not included. Stupec responded that as long as both companies "adequately performed" as in the past, they would "get to keep doing what we've been doing for 60 years." Michael DeGidio allegedly signed the contract on behalf of both entities based on Stupec's promise. The 2007 Agreement provides that it "represents the entire agreement between [IC and LDI]. . . . [A]ll previous agreements (if any) are hereby terminated." Plaintiffs now argue, inconsistent with their SAC, that LDSI was not a party to the 2007 Agreement, instead having a separate implied-in-fact oral contract with IC.

The 2007 Agreement's three-year term began November 15, 2007. Section 16 provided that the Agreement "may be terminated or cancelled by either party without cause with sixty-day written notice." On or about November 15, 2010, LDI stopped business activities, including placing orders and issuing payments to IC. LDSI began purchasing burners as well as replacement parts from IC. IC continued selling burners and parts to the DeGidio distributorship. Whether the 2007 Agreement continued to apply after its three-year term is at issue.

Relations soured when LDSI's purchases from IC began declining in 2015. The parties failed to agree how to address the decline. In September 2019, IC gave LDI notice it would terminate the distributorship in thirty days. LDI, LDSI, and

-3-

James and Michael DeGidio filed this diversity action on October 10, seeking a declaratory judgment that the Minnesota Franchise Act precludes termination without good cause; and damages for violation of the Franchise Act, see Minn. Stat. § 80C.17, subd. 1, and for breach of contract, fraud, negligent misrepresentation, estoppel, tortious interference, and unjust enrichment. On October 17, IC issued a revised notice giving LDI sixty days notice, as the 2007 Agreement required.

The district court denied plaintiffs' motion for a preliminary injunction enjoining IC from terminating the distributorship. The court later dismissed the individual plaintiffs' claims, LDI's Franchise Act claim, all fraud and negligent misrepresentation claims, and some promissory estoppel claims. More than a year later, the court granted IC's motion for summary judgment dismissing the remaining claims. Louis DeGidio, Inc. v. Indus. Combustion, Inc., No. CV 19-2690, 2021 WL 6127865 (D. Minn. Dec. 28, 2021). Plaintiffs appeal the dismissal of LDSI's Minnesota Franchise Act, breach of contract, and the promissory estoppel claims. Dismissal of the tortious interference and unjust enrichment claims is not at issue.

## II. Discussion

**A. Minnesota Franchise Act Claim.** The Minnesota Franchise Act provides that it is an unfair practice to "terminate or cancel a franchise except for good cause." Minn. Stat. § 80C.14, subd. 3(b). In terminating the DeGidio distributorship, IC invoked the termination-without-cause provision in the 2007 Agreement. Plaintiffs argue the distributorship was a franchise entitled to for-cause protection. Under Minnesota law, a franchise exists when the franchisee, defined as "a person to whom a franchise is granted," § 80C.01, subd. 5, (1) has the right to distribute goods or services using the franchisor's trade name, trademark, or similar commercial symbol; (2) shares a community of interest with the franchisor in marketing goods or services; and (3) pays a franchise fee. Id. at § 80C.01 subd. 4(a). If all three factors are met, "[f]ranchise status is acquired . . . regardless of the labels used by the parties." Upper

Midwest Sales Co. v. Ecolab, Inc., 577 N.W.2d 236, 241 (Minn. App. 1998). The issue is whether LDI or LDSI paid IC a franchise fee.

A franchise fee is "any fee or charge that a franchisee . . . is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement." Minn. Stat. § 80C.01 subd. 9; see Banbury v. Omnitrition Int'l, Inc., 533 N.W.2d 876, 882 (Minn. App. 1995). A franchise fee can include "any payment for goods or services." Thus, "[a] price mark-up on goods above a bona fide wholesale price may constitute an indirect franchise fee." Coyne's & Co. v. Enesco, LLC, 553 F.3d 1128, 1132 (8th Cir. 2009). However, "the purchase of goods or agreement to purchase goods at a bona fide wholesale price" is not the payment of a franchise fee. § 80C.01 at subd. 9(a).

Throughout the distributor relationship, LDI and then LDSI purchased replacement parts from IC. Some were manufactured by third party original equipment manufacturers ("OEM"). The parties agree that IC sold OEM parts above wholesale prices. But that was because IC bought these parts from the OEM vendors at *their* retail prices. IC encouraged but did not require distributors to buy OEM parts from IC. Under its price-match program, IC would match the prices of other OEM parts vendors. LDSI frequently took advantage of that program. It also purchased parts directly from other OEM vendors when IC was out of stock, less convenient, or not interested in matching the other vendor's price. The district court concluded that these inducements to purchase OEM parts from IC "were not a requirement . . . to do business with IC and thus cannot constitute a franchise fee." Louis DeGidio, Inc., 2021 WL 6127865, at *4. We agree.

On appeal, plaintiffs argue that IC imposed sales goals and quotas that pressured LDSI to purchase replacement parts from IC at above wholesale prices. The prices were an indirect franchise fee, they argue, because failing to meet IC's sales requirements would result in termination. See Upper Midwest Sales Co., 577

N.W.2d at 242. However, while sales above bona fide wholesale prices *can* constitute an indirect franchise fee, many do not. The Franchise Act only states the converse -- goods sold at bona fide wholesale prices "shall *not* be considered the payment of a franchise fee." § 80C.01 subd. 9 (emphasis added). For sales at a higher price to constitute a franchise fee, there must be evidence of compulsion accompanied by the threat of termination. In Coyne's, for example, we held that the manufacturer's mark-up on sales to the distributor was not an indirect franchise fee because it "merely represented CA's profits on the Products [and therefore was] a bona fide wholesale sale." 553 F.3d at 1132. Here, the prices LDSI paid for replacement parts manufactured by a third party OEM would be above the wholesale price for those products, whether purchased from IC or directly from the OEM vendor.

We agree with the district court that plaintiffs presented insufficient evidence that IC required LDSI to purchase minimum quantities of replacement parts in order to continue the distributorship business. Plaintiffs point to a 2019 e-mail from IC suggesting a $100,000 sales target and testimony that IC expected plaintiffs to meet its sales goals. But James DeGidio admitted the "vast majority" of all purchased products were IC-manufactured burners and parts -- indeed, LDSI purchased more than $100,000 in IC burners alone in the three fiscal years before 2019. Purchase of replacement parts was necessary to meet LDSI's responsibility as a distributor to service IC burners. But there is no evidence IC ever terminated a sales representative for failing to purchase replacement parts from IC, and no evidence LDSI agreed to make payments to IC above bona fide wholesale prices "for the right to . . . continue a business under a franchise agreement." Bitronics Sales Co. v. Microsemiconductor Corp., 610 F. Supp. 550, 559 (D. Minn. 1985). A payment is not an indirect franchise fee absent a threat of termination for non-payment. See OT Indus., Inc. v. OT-tehdas Oy Santasalo-Sohlberg Ab, 346 N.W.2d 162, 166-67 (Minn. App. 1984). "Ordinary business expenses and reasonable minimum purchase requirements do not constitute franchise fees." Coyne's & Co. v. Enesco, LLC, 565 F. Supp. 2d 1027, 1048 (D. Minn. 2008).

**B. Breach of Contract.** In its motion for summary judgment, IC argued that plaintiffs' breach of contract claim should be dismissed for two distinct reasons. First, although the three-year 2007 Agreement expired on November 15, 2010, the Agreement's termination-without-cause provision governs this dispute because Minnesota courts will find an implied contract extending the term of an expired contract when, as in this case, performance under the new contract "flow[s] continuously from the performance that took place under the original contract [and] the parties' performance must be substantially unchanged following the contract's expiration." Tri-State Bobcat, Inc. v. FINN Corp., 338 F. Supp. 3d 971, 982 (D. Minn. 2018) (quotation omitted). Alternatively, if the 2007 Agreement was not extended by performance, Stupec's promise that the sales representative would "get to keep doing what we've been doing for 60 years" was not made to induce the oral implied contract alleged by LDSI and was too indefinite to alter the terms of that contract. Therefore, the alleged oral contract is governed by the general rule that a contract with no definite duration "is terminable by either party at will upon reasonable notice to the other." Benson Coop. Creamery Ass'n v. First District Ass'n, 151 N.W.2d 422, 426 (Minn. 1967).

LDSI argued it was not a party to the 2007 Agreement and the merger clause limits its applicability to the parties. Rather, LDSI and IC were parties to a separate oral implied contract that could not be terminated without cause based upon Stupec's promise in 2007 that if LDSI "adequately performed" as in the past, it would "get to keep doing what we've been doing for 60 years."

The district court concluded "the facts show, that the performance continued unhindered after the expiration of the 2007 Agreement." Louis DeGidio, Inc., 2021 WL 6127865, at *5. But the court did not decide whether LDSI was bound by the 2007 Agreement because its contract claim fails even if LDSI had an independent implied-in-fact contract with IC.

**1.** As the district court noted, the record shows that Stupec assured James and Michael DeGidio in 2007 that IC would treat the two corporations as the same entity. The DeGidios decided, *at the time the 2007 Agreement expired*, to have LDI cease business activities. This unilateral decision did not change the performance of the parties' longstanding business relationship, except that LDSI began purchasing burners as well as replacement parts from IC. The 2007 Agreement provided that LDI could not assign its rights or responsibilities under the Agreement "without the express written consent of IC." Apparently, such consent was never sought or given, but the parties' performance after expiration treated LDSI as the purchasing distributor, consistent with Stupec's assurances when the Agreement was signed.

Though the district court did not reach the issue, we have no difficulty concluding that, under Minnesota law, the 2007 Agreement continued to bind both LDI and LDSI from its expiration in November 2010 until termination in 2019. Stupec's oral assurances cannot modify the explicit termination provision in that written Agreement. Even in a contract having no definite duration, "such assurances contain nothing more than general statements that are too indefinite to create a legally enforceable offer for a durational term." Minn. Deli Provisions, Inc. v. Boar's Head Provisions Co., 606 F.3d 544, 549 (8th Cir. 2010).[2]

**2.** We further agree with the district court that LDSI's contract claim fails even if it is based on an independent implied-in-fact contract with IC. The essential

---

[2]In arguing that Stupec's assurances raise a disputed issue whether the alleged implied-in-fact contract was terminable only for cause, LDSI relies entirely on Minnesota cases dealing with whether an employer's representations created an employment agreement terminable only for cause. Compare Rognlien v. Carter, 443 N.W.2d 217 (Minn. App. 1989), and Eklund v. Vincent Brass & Aluminum Co., 351 N.W.2d 371, 373, 377 (Minn. App. 1984), with Cederstrand v. Lutheran Bhd., 117 N.W.2d 213, 222 (Minn. 1962). The employment relationship is distinct from the distributor relationship between independent businesses at issue in Minnesota Deli.

question that plaintiffs never address is, what were the terms of the alleged implied-in-fact contract? If LDSI was not a party to the 2007 Agreement, then it acted as a third party allowed by LDI and IC to purchase replacement parts from IC and service burners sold by LDI to satisfy LDI's responsibilities under the 2007 Agreement. That did not make LDSI a distributor or a sales representative; it was simply a third party carrying out LDI's responsibilities. When LDSI purchased replacement parts from IC under this arrangement, those were not purchases under an implied-in-fact distributorship agreement. They were individual purchase and sale transactions, a relationship either party had the unilateral right to discontinue at any time.[3]

When LDSI stepped into the shoes of LDI in November 2010 and began buying burners as well as replacement parts from IC, did that change the nature of its alleged oral contract with IC? This unilateral action did not terminate or modify the 2007 Agreement between LDI and IC. Michael DeGidio signed the 2007 Agreement relying on IC's assurance that his signature represented both DeGidio corporations. After November 2010, IC continued to treat LDSI as a party to the contract. Plaintiffs offered no evidence that LDSI understood it was functioning outside the written distributorship agreement. In these circumstances, if there was a *separate* implied-in-fact agreement between LDSI and IC, we agree with the district court that it was governed by the general rule "that a contract having no definite duration *expressed or which may be implied* is terminable by either party at will upon reasonable notice to the other." Loftness Specialized Farm Equip., Inc. v. Twiestmeyer, 742 F.3d 845, 853 (8th Cir. 2014) (emphasis in original, quoting Benson Coop. Creamery Ass'n, 151 N.W.2d at 426).

---

[3]When asked at his deposition whether LDSI had any contract with IC, James DeGidio answered: "No, other than we would buy their products. It was basically a performance type of deal. Order a product, get a PO, they confirm . . . what we ordered, they send it, we paid for it, and we repeated that cycle for over 10 years."

Whether Stupec's 2007 statements created an implied contractual term is a question of law. See Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 740 (Minn. 2000). As in Minnesota Deli, we "simply cannot conclude that [these informal, indefinite comments], when read in context, creates an enforceable limit on [IC's] right to terminate business relations." 606 F.3d at 550. We affirm the dismissal of plaintiffs' breach of contract claim.

**C. Promissory Estoppel**. To succeed on a promissory estoppel claim under Minnesota law, plaintiffs "must show that (1) there was a clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice." Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 834 (Minn. 2011). The reliance must be reasonable. See Meriwether Minnesota Land & Timber, LLC v. State, 818 N.W.2d 557, 567 (Minn. App. 2012). Plaintiffs argue that even if Stupec's statement failed to create a contractual term, the district court erred in dismissing their promissory estoppel claim because the court ignored evidence that the statement was made to and relied upon by LDSI, as well as LDI, and therefore IC is estopped to deny that its oral implied-in-fact contract with LDSI was terminable only for cause.

We agree with the district court that the alleged reliance was not reasonable. When the 2007 Agreement was signed, IC assured LDSI that, although it was not a named party to the Agreement, IC considered the two corporations the same entity. They were IC's sales representative in the territory. The Agreement expressly provided for no-cause termination and barred oral modifications. Reliance on an oral representation is unreasonable as a matter of law "if the written contract provision explicitly stated a fact completely contradictory to the claimed misrepresentation." Johnson Building Co. v. River Bluff Dev. Co., 374 N.W.2d 187, 194 (Minn. App. 1985).

Moreover, "promissory estoppel is a creature of equity which implies a contract in law where none exists in fact." Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (Minn. 1995) (quotation omitted). Where a contract exists, a claim for promissory estoppel necessarily fails. See Banbury v. Omnitrition Int'l, Inc., 533 N.W.2d 876, 881 (Minn. App. 1995). In this case, both parties agree that one or more written or oral contracts existed prior to termination. After LDI ceased business activities in November 2010, LDSI had a contract of *some kind* with IC, either the 2007 Agreement, a separate oral implied-in-fact contract, or a continuing series of purchase and sale transactions. As in Homestar Property Solutions, LLC v. Safeguard Properties, LLC, LDSI's "promissory estoppel claim is inseparable from its breach of contract claim." 370 F. Supp. 3d 1020, 1029 (D. Minn. 2019). The promissory estoppel claim was properly dismissed.

The judgment of the district court is affirmed.
_____