# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1402

_____

Rita Lamoureux, as trustee of the Rita Lamoureux Trust

*Plaintiff - Appellee*

v.

MPSC, Inc., also known as Meat Processing Service Corporation, Inc.

*Defendant Third Party Plaintiff - Appellant*

v.

Rita Lamoureux, individually

*Third Party Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: November 17, 2016
Filed: February 27, 2017

_____

Before BENTON and SHEPHERD, Circuit Judges, and EBINGER,[1] District Judge.

_____

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa, sitting by designation.

SHEPHERD, Circuit Judge.

MPSC, Inc. was a start-up company with an innovative idea—the patented "Rinse & Chill service"—but no capital. An angel investor, John Lamoureux, provided the necessary capital in exchange for a royalty fee every time the company used its patented service. The contract specified three events that would terminate the agreement but did not specify a termination date. MPSC now asks the courts to supply an at-will termination term. The district court[2] declined to do so. We affirm.

## I. Background

MPSC is a Minnesota corporation in the meat-processing business with its principal place of business in Wisconsin. In the 1980's, MPSC developed a new meat-processing technique called Rinse & Chill. The technique improved the amount and quality of the meat removed from the animal. But the company had a problem familiar to many start-ups: lack of capital to fund their innovation. So MPSC solicited investors to provide the needed capital. John Lamoureux, a resident of Florida, responded.

The two parties entered into an Investment Agreement in 1987. The agreement called for Lamoureux to pay MPSC the amount of $150,000. In return, he received the "rights to $1.50 per animal processed by MPSC, up to a maximum of the first five hundred (500) animals per day, for 260 days per year, as long as this agreement remains in effect." Paragraph five of the agreement discusses termination *events*:

> 5. This agreement shall terminate upon the happening of any of the following events:

---

[2]The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota.

-2-

(a) The dissolution, bankruptcy, insolvency or receivership of MPSC;

(b) The demise of the legal holder(s) of this agreement under such circumstances that no survivor or survivors of the holder(s) can be located;

(c) Written agreement of MPSC and the legal holder(s) of this agreement.

The agreement makes no mention of a termination *date*. It also states that "MPSC agrees there shall be no restriction to the transfer of rights granted by this agreement."

Some 25 years later, MPSC determined that because the agreement did not contain a precise termination date, MPSC had the right to terminate the agreement at will after providing reasonable notice. By this time, John Lamoureux had passed away, survived by his wife, Rita. In the spring of 2013, MPSC's president met with Rita and notified her of MPSC's determination. MPSC ceased making payments shortly thereafter.

Rita subsequently filed a lawsuit alleging breach of contract in the United States District Court for the District of Minnesota. The district court had diversity jurisdiction under 28 U.S.C. § 1332. MPSC counterclaimed,[3] and then each party moved for summary judgment. The district court granted summary judgment to Rita and against MPSC. The court first looked at the agreement's text, which expressed no termination date or time period for the payments to continue. Rather, the district court noted, the agreement spells out three types of events, any of which would terminate the agreement. The court noted also that the agreement calls for payments to continue "as long as this agreement remains in effect." Together the termination events and the "as long as" language created a clear duty for MPSC to continue

---

[3]This counterclaim involved an indemnity agreement between MPSC and Rita Lamoureux. The district court held against MPSC on this claim, and MPSC did not appeal. So we do not discuss the indemnity agreement or any facts related to it.

payments until the occurrence of any termination event, according to the district court. The court then considered Minnesota law and found that no specified termination date is required when the obligor's performance is conditioned on conduct within the obligor's control. And since MPSC has total control over whether it processes meat, the district court held the agreement valid as written; MPSC could not terminate the investment agreement at will. MPSC now appeals.

## II. Discussion

"Minnesota law governs this diversity action." Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 951 (8th Cir. 2012). We review a district court's grant of summary judgment de novo. Kobus v. Coll. of St. Scholastica, Inc., 608 F.3d 1034, 1035 (8th Cir. 2010). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Both parties agree there are no genuine issues of material fact in this case. Only questions of law—Minnesota contract law—are disputed.

To properly interpret a written contract, we first examine the text of the contract to identify the parties' intent. Dykes v. Sukup Mfg. Co., 781 N.W.2d 578, 582 (Minn. 2010). "Intent is ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract . . . as a whole." Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 324 (Minn. 2003) (citation omitted). Unambiguous contract language will be given its plain meaning. Savela v. City of Duluth, 806 N.W.2d 793, 796-97 (Minn. 2011).

In this case, the Investment Agreement unambiguously calls for MPSC's continued performance for as long as it processes meat, unless one of the termination events occurs. This is true for three key reasons.

First, the termination clause offers no specific end date or duration for MPSC's contractual obligations. Rather, it lists three termination events. This suggests the parties intended for the express termination events to serve as the exclusive means of contract termination. See Weber v. Sentry Ins., 442 N.W.2d 164, 167 (Minn. Ct. App. 1989) ("The well-recognized rule of 'expressio unius est exclusio alterius' provides that the expression of specific things in a contract implies the exclusion of all not expressed."). The types of events chosen to terminate the contract bolsters our conclusion. The first termination event was a very real possibility at the time the parties entered into the Investment Agreement. Many start-up companies fail financially before they have a chance to provide any kind of return to investors. The second termination event calls for the contract to end when no survivor(s) of the agreement's legal holder can be found. This event appears to contemplate the benefits of the royalty payments passing from one generation to the next. The third termination event resembles a residual, catchall method of terminating the contract by written agreement between the parties. On the surface, this clause seems meaningless; any contract can be terminated by later written agreement. But if the parties intended for this list of events to serve as the exclusive means of contract termination, then the inclusion of a residual clause makes perfect sense.

Second, the contract as a whole evinces an intent for continued performance. The contract specifically states that MPSC's obligations continue "as long as this agreement remains in effect." At first glance, this phrase looks to be pure tautology. But, when read together with the three termination events, it takes on real meaning. MPSC owes the rights holder "as long as" one of the three termination events has not occurred and MPSC still processes meat. A separate clause in the agreement disallowing any restriction on transfer offers further evidence of intent for continued

performance. The underlying premise of that clause is the same as that of the second termination event—an intent for the rights to the royalty payments to pass to the successors of the rights holder.

Third, continued performance fits with the purpose of the contract as a whole. See Motorsports Racing, 666 N.W.2d at 324. This is an investment agreement. The purpose of this kind of contract is clear: an offer of cash from an angel investor to get a start-up off the ground in exchange for a slice of the rewards should the start-up succeed. See Holdahl v. Bioergonomics, Inc., No. A12-1495, 2013 WL 401885, at *1 n.1 (Minn. Ct. App. Feb. 4, 2013) (discussing angel investors). A variety of financial arrangements can fulfill this purpose. A common form of investment agreement consists of the start-up granting the angel investor an equity stake in the company. See Darian M. Ibrahim, The (Not So) Puzzling Behavior of Angel Investors, 61 Vand. L. Rev. 1405, 1422 (2008). Here, we see an alternative investment agreement where the start-up retains all of its equity but instead offers a stream of royalty payments based on the product's use. If John Lamoureux had taken an equity stake in the company, MPSC surely could not come back some 25 years later, after it had achieved great success, and erase Lamoureux's equity stake. Likewise, we see no reason to presume that a stream of royalty payments, paid out as part of an investment agreement, can be terminated except under the terms of that agreement.

For these reasons, we conclude that the express terms of the Investment Agreement compel MPSC's continued performance. MPSC can relieve itself of continued performance only if some principle of Minnesota contract law overrides the express terms of the contract.

MPSC argues that Minnesota contract law requires us to supply an at-will termination provision to the Investment Agreement because the agreement has no definite duration. See Minn. Deli Provisions, Inc. v. Boar's Head Provisions Co., 606

F.3d 544, 549 (8th Cir. 2010). MPSC relies primarily on two Minnesota state cases to support its argument. In Hayes v. Northwood Panelboard Co., a letter sent by a plywood manufacturer to a logging company stated that the manufacturer would purchase wood "annually" from the logging company. 415 N.W.2d 687, 689 (Minn. Ct. App. 1987). When the manufacturer stopped purchasing wood, the logging company filed suit but lost at trial. Id. On appeal, the court held, "Because [the] letter is indefinite as to its durational terms, the trial court properly ruled that any contract based on the letter was indefinite as a matter of law and could be terminated at will." Id. at 691. In Rosenberg v. Heritage Renovations, LLC, a real-estate broker contracted with a developer to sell several hundred condominium units. 685 N.W.2d 320, 322 (Minn. 2004). The developer terminated the agreement before all units were sold. Id. at 323. The broker sued, but the trial court held in favor of the developer. Id. at 323-24. On appeal, the Minnesota Supreme Court held, "Because there is no definite date in the contract or even an event from which one could reasonably determine a definite date, . . . the district court could properly conclude that the lack of a specific termination date rendered the [contract] terminable at will." Id. at 326. Here, the Investment Agreement is terminable at will, MPSC contends, because the agreement is an indefinite contract—it lacks either an expressed or implied definite duration.

But we disagree; Minnesota law makes clear that a contract is not indefinite when a party's performance is conditioned on conduct within that party's control. See Minn. Deli, 606 F.3d at 549 ("Minnesota law does not, however, permit unilateral termination at will in cases where the contract provides that it will continue 'so long as' one party performs satisfactorily."); Benson Co-op. Creamery Ass'n v. First Dist. Ass'n, 151 N.W.2d 422, 427 (Minn. 1967) (holding that if the obligor's performance was conditioned on the obligee remaining in the obligor's association, then the obligor could not terminate the contract at will); Legred v. Smeal Pork Co., No. C9-02-619, 2002 WL 31819222, at *2 (Minn. Ct. App. Dec. 17, 2002) (holding that a contract between a pork company and its marketer was not of indefinite duration

because performance was called for "as long as" the pork company kept a particular breed of hog in its herd). Here, MPSC must pay royalty fees "as long as" it processes meat (or until one of the termination events occurs). The choice to process meat, which triggers the contractual obligation to pay, rests entirely at MPSC's discretion. Thus, under Minnesota law, the Investment Agreement is not indefinite; no at-will termination provision need be added by the courts.

Even the cases cited by MPSC fail to support its contention that this particular agreement is terminable at will. The jury in Hayes determined that no contract actually existed between the parties. 415 N.W.2d at 689. So no durational term—definite or indefinite—actually existed in that case. Rosenberg, on the other hand, involved an employment agreement. "Under Minnesota law, an employment agreement with no definite expiration date is presumed to be at will." Rosenberg, 685 N.W.2d at 326. Employment contracts implicate the law's aversion to involuntary servitude. See 25 Williston on Contracts § 67:102 (4th ed. 2002) (discussing the judiciary's "repugnance" to involuntary servitude in employment contracts). So it makes sense for Minnesota courts to demand a definite expiration date in an employment contract. Yet a concern for involuntary servitude is not present here. After all, this is an Investment Agreement, not an employment contract.

MPSC's last argument relies on a decision from the Fifth Circuit supplying an at-will termination provision to a contract with specified termination events but no termination date. In Trient Partners I Ltd. v. Blockbuster Entertainment Corp., a limited partnership (Trient) entered into a licensing agreement with Blockbuster to own and operate a number of Blockbuster stores in a given geographic area. 83 F.3d 704, 706 (5th Cir. 1996). The License Agreement stated that it would "continue indefinitely . . . until terminated in accordance with the provisions hereof." Id. at 709. The referenced provision contained four terminations events:

(1) defaults by either party that are not or cannot be cured within a specified number of days; (2) the death or incapacity of a natural person who is one of Trient's partners, if Blockbuster does not consent to the transfer of the deceased partner's interest; (3) the transfer or change of control of Trient's partnership without Blockbuster's prior approval; and (4) the insolvency of either party.

Id. Analyzing the agreement, the Fifth Circuit found that the termination events did "not limit the duration of the License Agreement or make its duration determinable in any real or concrete way." Id. The agreement was therefore terminable at will. Id.

Unfortunately for MPSC, the Fifth Circuit's decision examines a factually distinguishable contract with inapplicable legal analysis. The agreement in Trient states that it will "continue indefinitely," whereas the Investment Agreement here makes no such statement. Turning to the legal analysis, the Trient court analyzed a contract under Texas—not Minnesota—state law. Id. at 708. And precedent from our own circuit stands opposed to Trient's principal holding. In Southern Wine & Spirits of Nevada v. Mountain Valley Spring Co., we held a contract had a definite duration when the contract stated that it would terminate upon the occurrence of a termination event, without any mention of a durational term. 646 F.3d 526, 532 (8th Cir. 2011) (applying Nevada law).

## III. Conclusion

The clear intent of the Investment Agreement is for MPSC's continued performance as long as it processes meat and none of the three termination events occur. We see no principle of Minnesota state law or general contract law that overrides the agreement's intent. Thus we affirm the district court.

_____

-9-